## JAMES S. CONWAY AND OTHERS, *Ex Parte.*

The general jurisdiction of this Court is *appellate,* and most of the writs that it is authorized to issue, are in aid of its appellate powers; but it has undeniable authority to issue other writs, as a portion of its *original* constitutional jurisdiction, among which is the writ of mandamus.

It has been the constant and invariable practice of this Court, to issue writs of mandamus, whenever the party applying showed that he was legally entitled to their benefit, and to direct them either to ministerial or judicial officers.

When addressed to *judicial* officers, they can be executed only in term time; but when addressed to ministerial officers, they may be executed at any time.

The issuing or refusing an injunction, is not a *judicial* act, but the exercise of a ministerial discretion.

If, therefore, an injunction has been improperly refused, this Court will, under our statute, award a peremptory mandamus to the Judge, commanding him to grant the writ.

Trustees appointed by a deed of assignment for the benefit of creditors, executed by a bank, have a right to proceed in equity against directors who refuse to deliver over to them the property and assets of the Bank, in order to have the property surrendered, and the directors enjoined from intermeddling with it; and the bill, in such case, is a bill to have the trust established and protected.

And, the deed in such case conveying the property absolutely, by words of present grant, and expressly providing that the property shall be delivered to the trustees, immediately on the execution of the deed, a stipulation in the deed that each trustee shall execute a certain bond, is not a *condition* at all, in the technical meaning of the term, and, if a condition, is only a condition subsequent, and not a condition precedent, to be performed before the estate vests, or the trustees are entitled to the property.

And, therefore, when the bill is filed to obtain the property, it is no ground for refusing the relief, that part of the trustees have not given bond.

Conway et al., *Ex Parte.*

There is no necessity for the trustees to sign such a deed, to make it valid, in the first instance; but any act done by them, which shows their assent, will make it obligatory on them, and equity will enforce the trust.

Resolutions, passed by the directory who ordered the deed to be made, and approved it before its execution, restricting the delivery of the property, cannot alter or vary its legal tenor or effect; and, if such resolutions provide that the property should not be delivered until a third person should certify to the directory that certain of the trustees had executed bonds, the accidental or culpable negligence of that person could not prejudice the rights of the trustees, much less those of the stockholders and *cestuis que trust.*

The moment the deed was executed, the relation of trustee and *cestui que trust,* placed the estate under the jurisdiction of a court of equity; and, if there could possibly arise any difficulty upon the subject, that jurisdiction would still pursue the estate, and transfer its possession to the trustees who had given bond, holding it for the others to come in and give bond, and, if they failed, in a reasonable time, to do so, would remove them from office, and cause others to be put in their places.

The right of a court of equity to entertain such a bill, flows from the familiar and universally attested 'fact, that the establishment, enforcement, and protection of trusts, constitute one of the great original branches of equity jurisdiction.

As chancery will compel the performance of trusts, so it will assist the trustees, and protect them in the due performance of the trust, whenever they seek the aid and direction of the Court, as to its establishment, management, and execution.

It is a fundamental rule, that if, originally, the jurisdiction attached in equity, on account of any supposed defect of remedy at law, the jurisdiction is not changed or abridged by courts of law now entertaining suits in cases where they were formerly rejected.

It is no objection to the jurisdiction of courts of equity, that a party has a remedy at law, unless it be shown that the legal remedy is *plain, direct* and *complete.* No action at law would, in the present case, afford such a remedy.

A court of chancery will interfere, by injunction, where the remedy at law is doubtful or difficult, or to prevent a multiplicity of suits.

In such a bill by the trustees, where the bill prays, "to the end that the trust smay be established, and the complainants protected and aided in the performance and discharge thereof," that the defendants "be perpetually restrained from further intermeddling with any of the property, effects, or assets of the Bank;" this is tantamount to a prayer that the property may be surrendered and delivered to them; and there is no necessity for a prayer for general relief, or a particular prayer for the surrender and delivery of the property. To restrain the directors from intermeddling with it, necessarily transfers it to the trustees.

It is true that the general principle is, that the Court will not, by a preliminary injunction, change the possession of property, and transfer it to the complainant. But this is a rule to which there are exceptions.

The interference, in the present case, as in cases of nuisance, rests upon the principle of a clear and certain right to the enjoyment of the subject in question, and an injurious interruption of that right, which, upon just and equitable grounds, ought to be prevented.

If the possession of the defendant is a mere *interruption* of the prior possession of the plaintiff, the interruption will be remedied by injunction, if the right is clear and certain, without driving the plaintiff to establish his title at law.

And the general rule only holds, in cases where the right to possession cannot be settled until a final decree.

By filing such a bill, the trustees become officers of the Court, stand in the same attitude as if they had originally been appointed by the Court, and are to be regarded, in this point of view, merely as receivers.

A debtor, in failing circumstances, has a right to prefer one creditor, or set of creditors, to another, in all cases not affected by the bankrupt or insolvent laws.

He may make the assignment for the benefit of a single creditor, in exclusion of all others; or he may distribute his property in unequal proportions among a part or the whole of them. No matter how, or on what principles the distribution is made, provided he assigns the whole of his property for the payment of his just debts.

Conway et al. *Ex Parte.*

And a corporation, whether public or private, unless it is restrained by the provisions of its charter, has the same power as an individual, to assign its property to trustees to pay its debts; and, like an individual, it may make such an assignment, whether it is solvent or insolvent. And this is true, whether the assignment be partial or general, if it transfer the whole fund, in good faith, and without fraud.

Neither the stockholders or local directories of the Real Estate Bank could make such an assignment. The *Central Board* is the only organ by which that Bank can speak and act.

And the Central Board could order the Bank, by her corporate seal, to pass the legal right and possession, by a *bona fide* assignment to trustees, for the benefit of her creditors.

It is a universal rule, in the construction of all deeds, that fraud is never to be presumed.

That ten of the trustees were also members of the Central Board, who ordered the deed to be made, and composed a majority of it, is no objection to the deed.

The corporation is one thing, and its directors and stockholders entirely distinct and different things. They are different *legal* persons, having separate and distinct wills in law.

Nor can it be said that the Central Board, being themselves trustees, could not delegate their trust. They were not trustees, in the technical meaning of the term ; nor amenable to a court of chancery for their acts. Nor was the ordinance, by virtue of which the deed was made, a delegation of power.

There is no necessity that the trustees should execute such a deed, or enter into covenants to perform the trusts. The moment it is made, the right of property passes, and vests in the assignees, and the relation of trustee and *cestui que trust*, as between them and the creditors, is at once established, so that the assignor cannot recall the deed.

And the creditors are presumed to give their assent to such deeds, unless they come in, and specially object.

Though part of the trustees should be incompetent to take, a court of equity would not permit the trust to fail. It never wants a trustee.

If a trust is created, by deed, will, or operation of law, and no one appointed trustee, equity will follow the estate, and cause the trust to be executed. So, if the trustee dies, or is incompetent, equity will appoint.

It is no objection to such a deed, that it provides for reducing, after a certain time, the number of trustees.

Nor is it any objection, that part of the trustees are largely indebted to the Bank. Their appointment as trustees does not release or extinguish the debt. Their co-trustees may sue them in equity ; and their failure to pay would be a breach of trust, and good cause for removal.

Nor does the assignment to debtors create the slightest presumption of fraud.

Any assignment, which unnecessarily delays, or unjustly hinders, creditors in the collection of their debts, is, of course, fraudulent, and therefore void.

The Real Estate Bank is a public corporation, and the Court is bound judicially to know the condition of her liabilities and assets ; for these are to be found in the general history of the country, and in the reports of the Legislature, and her own sworn officers.

And from the condition of the Bank and of the country, the Court knows that the provision in the deed allowing the debtors of the Bank to pay their debts by equal annual payments, in eight years from the first of January, 1843, does not unnecessarily delay its creditors, but is a reasonable and proper indulgence ; and a less time would have seriously injured, as well the creditors, as the stockholders and the State.

No profits can arise to the trustees, in any case whatever.

Each trustee is responsible, for every *devastavit* he commits, not only to the extent of his bond, but to the full amount of *waste committed.*

It is no objection to such a deed, that it provides that the trustees may at once extinguish all its debts, by turning over all the assets to the bondholders.

It was not necessary for the Bank to be insolvent, or in failing circumstances, before it could make an assignment; and moreover, the Court judicially knows that she was in failing circumstances.

Conway et al., *Ex Parte.*

A bond, given as required by the deed, to the attorney of the Bank and his successors in office, is as legal as one given to the Executive and his successors in office. In both cases, the law makes the party to whom it is given, hold it only for the benefit of those for whom it was executed; and if he vacates the office, it passes, with all its attaching rights, into the hands of his successors, for like just and equitable purposes.

Whether the bonds are sufficient, as to amount, was a matter of discretion with the Central Board, which this Court cannot inquire into, unless it was so flagrantly unjust and inequitable, as to raise a presumption of fraud; which is not the case here.

The compensation of the trustees is, in the present case, a question only of policy and propriety, not affecting the validity of the deed, or raising any presumption of fraud.

That more onerous terms are imposed on debtors who have been sued, and against whom judgments have been obtained, is a matter of the same kind.

That the schedule attached to the deed is imperfect, is no objection. It may be completed hereafter.

The deed of assignment made by the Real Estate Bank, is, therefore, valid on its face, and contains no provisions that can defeat its operation, or raise an imputation of fraud against it.*

THIS case was presented to the Court on a petition for a *mandamus*, prayed to be directed to the Hon. JOHN J. CLENDENIN, Judge of the Fifth Judicial Circuit, requiring him to grant the injunction prayed for by the petitioners, *James S. Conway*, and others, trustees of the Real Estate Bank of the State of Arkansas, against *William Field*, and others, five of the directory of that Bank, at Little Rock. The original bill, praying the injunction, which was presented to the Chancellor, in April, 1842, and from which the case will be fully understood, was as follows:

*To the Hon.* JOHN J. CLENDENIN, *Judge of the Circuit Court of the State of Arkansas, for the county of Pulaski, sitting as Chancellor:*

Complaining, show unto your Honor, your orators, James S. Conway, Sam C. Roane, Carey A. Harris, Daniel T. Witter, George Hill, Enoch J. Smith, Henry L. Biscoe, William F. Moore, John Preston, jun., John Drennen, Robert S. Gibson, Lorenzo N. Clarke, Sandford C. Faulkner, Anthony H. Davies, and Silas Craig, all citizens of the State of Arkansas, that, on the first day of April, A. D. 1842, the Central Board of the Real Estate Bank of the State of Arkansas, at a meeting of said Board, held at the banking house, in

---

*The CHIEF JUSTICE held, that the bill, upon its face, showed no such case as authorized a court of equity to interfere, by injunction, because the *pretences* alleged in the bill, and the *charges* in response could not be considered in looking into the equity of the bill, and because there was no prayer for general relief; and further, and principally, because the trustees had a plain and adequate remedy at law. He further held, that the execution of their bonds by the trustees was a *condition precedent.* He agreed, that if the bill showed a proper case, this Court could grant the mandamus; and declined expressing any opinion as to the validity of the deed.

the city of Little Rock, adopted an ordinance, in the words following, to wit: " Whereas this Bank is, at present, unable to pay the immediate demands upon it, to resume the payment of specie on its notes, to meet the interest on the bonds of the State issued to it, or to protect its debtors from harassment and oppression, by the holders of its notes; and whereas, it is deemed just and reasonable, that its creditors should be secured, paid and indemnified, and its circulation called in, and, at the same time, its debtors guarded against oppression and ruin, and enabled to discharge the debts due by them to the institutution: Therefore, be it ordained by the Central Board of the Real Estate Bank of the State of Arkansas, that the affairs of this Bank be placed in liquidation, by an assignment of all the property and assets of this Bank to trustees, to be appointed by this Board, upon whom shall be conferred the power of settling the affairs of the Bank, by collecting the debts due to it, in certain instalments, and at certain times, and paying its debts and liabilities, in a certain order, to be in said assignment provided, with all other powers necessary to carry into effect the objects of the trust so created; and that the attorney of the Bank prepare such deed of assignment, which, when approved by this Board, shall be duly executed, and take effect."

Your orators further represent, that, in pursuance of said ordinance, a deed of assignment was prepared by said attorney, and was, on the second day of April, A. D. 1842, duly executed by said Bank, signed by Carey A. Harris, as President thereof, and sealed with the seal of said Bank, whereby said Bank conveyed unto your orators, who had been appointed trustees by said Central Board, and in conformity to, and under said ordinance, all and singular the estate, real and personal, debts, choses in action, property, effects, and interests, either legal or equitable, of every description, belonging to said Bank, or in which it had any right or interest whatever, mentioned, contained, or referred to, in the schedule thereto annexed, to have and to hold the same to your orators, their heirs, assigns, successors, and survivors, to their use and behoof for ever; but upon trust, that your orators should, with all reasonable speed, sell and dispose of such of said trust property and effects as were of a saleable nature, and use their best endeavors to obtain, recover, and receive such parts of the same, as

consisted of debts, and other outstanding interests, into their hands and possession, in a certain manner, by certain amounts and instalments, and at certain times, in said deed particularly specified; and that they should, forthwith, after the receipt of any moneys from any source, after deducting and retaining the compensation due for their services, as in said deed provided, and all such costs, charges, damages, traveling expenses, and other expenses and disbursements, as should be sustained, incurred, or reasonably due, in, for, or in relation to, the execution of the trusts of said deed, then upon trust, that your orators should appropriate all moneys, so received, to, and in payment of, all the debts, liabilities, and obligations of said Bank, in a certain manner and order, therein provided: which deed also contained special provisions for calling in the circulation of said Bank, and redeeming the same in specie, and gave your orators power to compromise debts, and to settle with debtors and creditors, agents and servants of said Bank, and to sell said trust property, for cash, or on credit.

Your orators represent, that, by said deed, said Bank constituted your orators, and their successors and survivors, to be its attorneys irrevocable, in their names, or in the name of said Bank, or otherwise howsoever, as the case might require, but to and for the trusts in said deed provided, to sue for, recover, and receive the outstanding debts, interests, trust property, and effects aforesaid, and to institute, prosecute, and defend, all such suits and processes, at law, or in equity, and to execute, perform, and transact, all such deeds and writings, acquittances, acts, matters, and things, as should be necessary or expedient to carry into effect the trusts, uses, intents, and purposes in said deed declared or contained.

Your orators further represent, that it was by said deed provided, that each of your orators should give bond, to the attorney of the Bank, for the time being, and his successors, for the benefit of all persons concerned or interested, in the sum of twenty thousand dollars, conditioned for the faithful discharge of his duties; that said deed constituted five committees of said trustees, and an executive board, and defined their powers and duties, and their compensation; provided, that the executive board should meet regularly, at Little Rock, and

constituted your orators, Carey A. Harris, Henry L. Biscoe, Sandford C. Faulkner, Daniel T. Witter, and Lorenzo N. Clarke, the first executive board, to act until the first day of July next; provided for the election of new members of said board by each committee, and for filling vacancies in said committees, or executive board; that, at the expiration of two years, the number of trustees should be reduced to five; that each committee should employ a clerk; appointed a cashier and secretary, and an attorney for said trustees, and fixed their salaries; provided for the removal of said attorney, and cashier, and secretary, for cause; gave to said trustees the power to employ and remove agents, attorneys, and clerks, and to fix, determine, and pay their compensation; and that, if any vacancy in said trustees should not be filled within three months after its creation, it should be filled by the proper chancellor; provided, that a majority of each committee, and of the Executive Board, should govern; and that it should not be necessary for all or either of said trustees to unite in doing any act, unless when it was in said deed specially provided. And it further provided, that said trustees might authorize, by power of attorney, one of their number to execute, and acknowledge conveyances; that said trustees should be liable to removal by the Chancellor, for misfeasance, mal-feasance, or non-feasance; and that, in case of any such offence, on charges preferred, the other trustees should suspend the offender. And it further provided, that, immediately upon, and after the execution of said deed, each of the boards of directors of said Bank should deliver over to the respective committees, all the effects, books, papers, notes, and other evidences of debt, and, all the moneys, bills, notes payable, and other assets in their possession, including all the circulation; and all the circulation thereafter received should be cancelled, registered, and burned; that the Directors of said Bank, and Presidents, and Central Board, should still exist, and be elected, but that no officer of said Bank should, thereafter, receive any compensation as such; that the bonuses due the State should be paid, from time to time, and the charter retained, with other minor provisions therein contained; which said deed was then executed by your orators, Sam C. Roane, Lorenzo N. Clarke, Daniel T. Witter, George Hill, Sandford C. Faulkner, Anthony H. Davies, William F.

Moore, Silas Craig, Henry L. Biscoe, and Carey A. Harris, the residue of your orators not being present. And said trustees so executing the same, covenanted thereby that they would execute and perform the trusts in them reposed, to the best of their judgment and discretion; provided, that each trustee, his executors and administrators, should not be liable or accountable for more money or effects than he should receive, nor for any loss or damage which might happen thereto, except the same should arise by or through his own wilful default; and that each should be answerable for himself, and not for the others: which deed was then, on said 2d day of April, duly acknowledged and delivered to your orators, as by a true copy thereof, and of said schedule, which is herewith exhibited, marked A, will more fully and at length appear; to which exhibit your orators pray that reference may be had, and the same taken as part of this bill.

Your orators further represent, that they thereupon entered on said trusts, and appointed Ewing H. Roane, in the absence of Thomas W. Newton, their Cashier and Secretary, to be the clerk of said Executive Board, who thereupon gave bond, and was by your orators placed in possession of the assets, and property of said Bank, at Little Rock. They farther represent, that, in the schedule annexed to, and referred to, in said deed, was embraced, among other things, the banking-house at the city of Little Rock, with all the furniture, and other property therein; all the bills, notes, and other evidences of debt due said Bank, then in the charge of the directory at Little Rock; all the money, assets, and circulation in said Bank at Little Rock, and every other species of property, and interests, effects, and credits of said Bank, under the control, and in the charge, of said directory.

They further represent, that said directory at Little Rock, and the stockholders of said Principal Bank, were fully represented in said Central Board, by all the delegates allowed said Principal Bank, by the charter, to wit: by Carey A. Harris, President; William Field, a State director; and Sam C. Roane, a director of the Principal Bank; and that all the stipulations and provisions of said deed, except the names of some of said trustees, and a few unimportant exceptions, in details, were *unanimously* approved by said Board; and, particularly, that said ordinance was passed by a unanimous vote; and,

by a like unanimous vote, the number of said trustees was determined at fifteen, and it was agreed that they should be stockholders.

Your orators further represent, that since said deed was executed, it has been approved of and assented to by a large majority of the stockholders of said Bank; as well, as they believe, of those at the Principal Bank, as at the branches; that possession has been readily delivered to your orators of all the effects and assets at the branches at Van Buren and Columbia, at which latter branch many notes have already been renewed to, and in the name of, the trustees; that the directory of the branch at Washington, on Saturday, the 16th instant, ordered a schedule to be made out of all their effects and assets, and appointed a meeting on Saturday last, for the purpose of delivering over the same, which your orators do not doubt, but believe, has been done; that the directory and stockholders of the branch at Helena, as far as your orators are informed, and as they believe, are ready and willing to deliver over their effects and assets, and would ere now have done so, if there had been any meeting of said directory; and that, so far as your orators have had the means of judging, the stockholders at the different branches are perfectly satisfied with the transaction, except in a very few instances of objection to the details of said deed: And furthermore, that a majority of said trustees have given bond as required by said deed.

And your orators hoped they would in like manner have obtained possession of the assets and property of said Bank at Little Rock, and kept possession of the same without difficulty or dispute, and been suffered and permitted to execute the trusts imposed on them, as in all faithfulness, integrity, and honesty, they desired to do.    But now so it is, may it please your Honor, that the said Wiliam Field, after aiding in perfecting said deed, together with William Cummins, lately appointed a State director for said Principal Bank, and Charles Rapley, William W. Stevenson, and James C. Anthony, all stockholders in said Bank, and all members of said directory, constituting a bare majority thereof, combining and confederating with other persons to your orators unknown, but whose names, when discovered, your orators pray may be inserted herein, with apt and sufficient words to charge them in the premises, and they made defendants hereto, for ends and pur-

poses to your orators unknown, but manifestly endeavoring to thwart and hinder your orators in performing the trusts conferred and imposed upon them, have taken possession of all the assets and property of said Bank at Little Rock, aforesaid, and refuse to deliver the same over to your orators, or to make or permit to be made any schedule thereof, or to permit your orators to receive and control the same, or perform the trusts aforesaid: For reason whereof, they pretend that said deed is void and fraudulent; whereas, your orators submit that said Central Board had the power to make the same, and that the same is good in law; and they also pretend that they are desirous of having its validity tested before the proper tribunal; whereas, they refuse to file a bill before your Honor to set the same aside, although your orators have requested them to do so: And they have, moreover, refused to permit your orators to institute an action of trover, in said Circuit Court against them, for some article of said property, and to appear to said action without process, so that said suit may be determined at the adjourned term of said Court, in May next, and in which suit the only question shall be the validity of said deed, although this proposition has been made to them by your orators: Wherefore your orators charge, that they do not desire to act legally in the matter, nor believe that said deed is illegal, but determine to hold said property with strong hand, and illegally and violently.

All which actings and doings are contrary to equity, and tend to defeat the object and purposes of said deed, to delay the creditors of said Bank, to depreciate sitll more her circulation, to prevent the collection of debts due her, to throw her affairs into irremediable confusion, and to ruin the stockholders, and work great loss and injury to the State. In tender consideration whereof, and inasmuch as said trusts can in no other way be enforced without great and ruinous delay, and tedious legal proceedings in a court of law, except by the interposition of your Honor, as Chancellor; and inasmuch as all of your orators, who have executed said deed, and their Cashier and Secretary, have executed such bonds as are required by said deed. To the end, therefore, that said trusts may be established, and your orators protected and aided in the performance and discharge thereof, and that said William Field, William Cummins, Charles Rapley,

Conway et al., *Ex Parte.*

William W. Stevenson, and James C. Anthony, may, on their oaths, full, true, direct, and perfect answer make, to all and singular the allegations and charges herein contained, as fully and particularly as though the same were here again repeated, and they thereto specially interrogated; and that, by a decree of your Honor's court, the said Field, Cummins, Rapley, Stevenson, and Anthony, who are made defendants hereto, and their agents and confederates, may be perpetually restrained and enjoined from further intermeddling with any of the property, effects, or assets, so assigned and transferred, may it please your Honor to grant unto your orators the State's writ of injunction, so restraining and enjoining them until the further order of this Court, as also the State's writ of subpœna, and your orators will ever pray, &c. *Pike & Baldwin, Solicitors.*

The bill was sworn to by four of the trustees, and a copy of the deed exhibited with it. On the 2d of May, the Chancellor endorsed on it his refusal of the injunction, " for want of jurisdiction." The trustees then presented to this Court their petition for a mandamus, under the statute authorizing the Supreme Court, or a judge thereof, to issue a mandamus in such a case.

On the argument in the Supreme Court, the following was filed and admitted:

In the application of James S. Conway, and others, for an injunc. tion against Field and others, before J. J. Clendenin, Judge of Pulaski Circuit Court, it was admitted, on the argument of the application to said Clendenin, that the Central Board that directed the assignment consisted only of Carey A. Harris, Sam C. Roane, L. N. Clarke, D. T. Witter, G. Hill, S. C. Faulkner, A. H. Davies, W. F. Moore, Silas Craig, H. L. Biscoe, William Field, and Elias Rector —ten of which first are the same persons named as assignees. It was also admitted, that many of said assignees were, at the time of assignment, largely indebted to the Real Estate Bank. It was also admitted, that at the same session of the Central Board that ordered said assignment, the resolutions herewith accompanying this statement, marked A and B, were passed, and were admitted as part of

Conway et al., *Ex Parte.*

the said application, before said Clendenin, and used in argument on said application.

[*Resolution marked A.*]

Mr. Field offered the following resolution:

*Resolved,* That the local Boards shall not be required to turn over to the trustees in the assignment of the Real Estate Bank of the State of Arkansas, any bills, bonds, or notes, mortgages, moneys, or any books, assets, or other things, belonging to the said Bank, until it shall have been certified to them by the attorney of the Bank, that there has been filed with him the necessary bonds of said trustees, and securities, as required by the assignment of said Bank." To which resolution Mr. Moore offered the following amendment : *Provided, however,* That, so soon as a majority of the Executive Board and local committee have entered into bond and security, they shall be competent to take charge of the assets assigned at the office at Little Rock; and, whenever two of the three appointed for the other offices have given bond, they shall be competent to take charge of the assets assigned at the several offices." And the ayes and noes being called for, were as follows, viz : *Ayes*—Messrs. Biscoe, Faulkner, Hill, Clarke, Witter, Craig, Roane, Davies, and Mr. President. *Noes*—Mr. Field. Mr. Field then moved to withdraw the resolution, which was assented to. Mr. Biscoe then offered the resolution withdrawn by Mr. Field, as his, adding to it the amendment as offered by Mr. Moore; on the adoption of which the vote stood as follows: *Ayes*—Messrs. Biscoe, Moore, Faulkner, Hill, Clarke, Witter, Roane, Davies, and Mr. President. *Noes*—Messrs. Craig and Field. So the resolution was adopted.

I, Thomas W. Newton, Cashier of the Real Estate Bank of the State of Arkansas, do certify, that the foregoing resolution, and proceedings thereon, are truly copied from the minutes of the Central Board of said Bank, at their called meeting, on the 4th day of April, 1842.

*Tho's W. Newton, Cashier.*

[*Resolution marked B.*]

Mr. Field then offered the following resolution:

*Resolved,* That the trustees and assignees of this Bank shall call

40

upon the local Boards, after having filed the bonds required by the deed of assignment, for the books, papers, bonds, mortgages, and assets of said Bank; and it shall be the duty of said local Boards, under their own supervision, and that of the trustees, to make out a schedule of all the notes, books, moneys, &c., belonging to, and appertaining to, said local Boards, and take a receipt from said trustees for the same, and file the same with the Secretary of State;" which resolution was unanimously adopted.

I, Thomas W. Newton, Cashier of the Real Estate Bank of the State of Arkansas, do certify, that the above resolution, and proceedings thereon, are truly copied from the minutes of said Central Board, at their called session, on the 4th day of April, 1842.

*Tho's W. Newton, Cashier.*

*Pike & Baldwin,* for applicants. Courts of equity exercise a very extensive influence in giving relief in case of chattels. It is said their influence is justified, and, was probably mainly caused by the insufficient and imperfect relief obtained in a court of law, by replevin. *Wallwyn vs. Lee,* 9 *Ves.* 33. *Fells vs. Reed,* 3 *Ves. jr.* 70. *Lowther vs. Lowther,* 13 *Ves.* 95. *Lloyd vs. Loaring,* 6 *Ves.* 773. *Duke of Somerset vs. Cookson,* 3 *P. Wms.* 390. 1 *Vern.* 273.

An injunction will be granted to prevent a multiplicity of suits. Even where the right is doubtful, and is to be sent to be tried at law, it will be sent *with an injunction.* But where the right is clear, an injunction is never refused. *Livingston vs. Van Sugen,* 9 *J. R.* 562, 569, 585. 3 *Story Eq.* 207, 226. *Nicoll vs. Trustees of Huntington,* 1 *J. C. R.* 166.

Courts of equity will always assist and protect trustees, and establish the trusts. 2 *Story Eq.* 229, 255, 302, 303. 1 *Story Eq.* 506, 507. *Mitford,* 4, 133.

Upon an assignment for the benefit of creditors, the assets are held to be placed under the jurisdiction of the court of equity. *Benson vs. Le Roy,* 4 *J. C. R.* 651, 656.

Equity has jurisdiction where the remedy at law is doubtful or difficult. *Rathbone vs. Warren,* 10 *J. R.* 595. *American Ins. Co. vs. Fisk,* 1 *Paige,* 90.

In case of an assignment like the present, if the assignor neglects to make out a schedule, the assignee may file a bill for discovery against him, and to obtain a delivery of the property; and is entitled to an injunction, restraining him from wasting the property. *Keyes vs. Brush*, 2 *Paige*, 311.

A debtor in failing circumstances, may prefer one creditor, or set of creditors, to another, by assigning his property for their benefit, in exclusion of his other creditors; provided, that he devote the whole of the property assigned to the payment of his just debts; that the assignment be absolute, and unconditional; that it contain no reservation, or condition, for his benefit; and does not extort from the fears or apprehensions of his creditors an *absolute* discharge, as a consideration for a partial dividend. These assignments have grown into use, and been sanctioned, by judicial decisions, in most of the States of the Union. *Grover vs. Wakeman*, 11 *Wend.* 187.

An assignment, for the benefit of all creditors, is good against subsequent attachments, although all the creditors are not parties to the deed before the attachments. The assent of creditors to an assignment, not stipulating a release, will be presumed. A general assignment is good, though it has imperfect schedules annexed to it, or does not fully enumerate all the debts, or describes the property generally, or gives preference to certain classes of creditors. The sole question that can arise, independent of the bankrupt laws, is, whether the conveyance is *bona fide* or fraudulent. It can be no question whether it is for a valuable consideration or not; because the debts due to the creditors constitute a valuable consideration, in the highest sense of the term; and the obligation of the trustee to perform the trust, according to the provisions of the deed, is a sufficient valuable consideration, so far as he is concerned. *Halsey vs. Whitney*, 4 *Mason*, 229. *Pickstock vs. Lyster*, 3 *M. & S.* 371. *Rex vs. Watson*, 3 *Price*, 6. *Cunningham vs. Freeborn*, 11 *Wend.* 240. *Mackie vs. Cairns*, 5 *Cowen*, 547. *Murray vs. Riggs*, 15 *J. R.* 571. 2 *J. C. R.* 565, *S. C. Estwick vs. Caillaud*, 5 *T. R.* 420. 2 *Ans.* 381, *S. C. Tarback vs. Marbury*, 2 *Vern.* 510. *Vredenburg vs. White*, 1 *J. Cas.* 156. *Hatch vs. Smith*, 5 *Mass.* 42. *Marbury vs. Brooks*, 7 *Wheat.* 556. *Brooks vs. Marbury*, 11 *Wheat.* 78. *Hastings vs. Baldwin*, 17 *Mass.* 552.

*Stevens vs. Bell,* 6 *Mass.* 339. *Will vs. Franklin,* 1 *Binn,* 502. *Lippincott vs. Barker,* 2 *Binn.* 174. *Livingston vs. Bell,* 3 *Watts,* 198. *Hower vs. Geesaman,* 17 *Serg. & R.* 251. *Dowdel vs. Hamin,* 2 *Watts,* 63. *Mintingham vs. Lafoy,* 7 *Cowen,* 785. *Wildin vs. Wynne,* 6 *Cowen,* 284. *Pearpoint & Lord vs. Graham,* 4 *Wash. C. C. R.* 232. *Todd vs. Bucknam,* 2 *Fairf.* 41. *Marston vs. Coburn,* 17 *Mass.* 454. *Andrews vs. Ludlow,* 5 *Pick.* 28. *Lupton vs. Cutter,* 8 *Pick.* 298. *Fox vs. Adams et al.* 5 *Greenl.* 245. *Canal Bank vs. Cox,* 6 *Greenl.* 395. *Russell et al. vs. Woodward,* 10 *Pick.* 408. *Ingraham vs. Wheeler,* 6 *Conn.* 277. 5 *Hammond,* 293. *Tucker vs. Aisby,* 12 *Pick.* 22. *Gore vs. Aisby,* 8 *Pick.* 555. *Baxter vs. Wheeler,* 9 *Pick.* 21. *New Eng. Bank vs. Lewis,* 8 *Pick.* 113; *Spring vs. S. C. Ins. Co.* 8 *Wheat.* 268. *Brashear vs. West,* 7 *Peters,* 608. *Moffat vs. McDowall,* 1 *McCord,* 434. *Armstrong vs. Byrne,* 1 *Edw.* 79. *Wakeman vs. Glover,* 4 *Paige,* 23. *Egberts vs. Wood,* 3 *Paige,* 517. *Cunningham vs. Freeborn,* 1 *Edw.* 256. *Lentilhon vs. Moffat,* 1 *Edw.* 51. *Maitland vs. Newton,* 3 *Leigh,* 714.

Such an assignment can be made by a bank, as well as by an individual; and the bank is under stronger obligations to make it than the individual, because she is not subject to the insolvent or bankrupt laws. *Union Bank of Tennessee vs. Ellicott et al.* 6 *Gill & John.* 371. *State of Maryland vs. the Bank of Maryland,* 6 *Gill & John.* 216.

This power, inherent in a corporation, can only be exercised through its agents. A corporation acts wholly by agencies. *Thomas vs. Dakin,* 22 *Wend.* 37, 70. In every corporation a majority acts, and binds the whole, irrespective of consent from the constituent, except by his representative. 22 *Wend.* 97.

The corporation is, in law, a single person, totally distinct from, and of another species, than the corporators. The property is vested in the corporation, and not in the individuals composing it. 22 *Wend.* 104. *Warner vs. Beers,* 23 *Wend.* 103, 173. *Pratt vs. Bacon,* 10 *Pick.* 126.

The corporators could not directly make the assignment, and their previous assent is wholly unnecessary. The Central Board was the legislature of the Bank. Having power to buy and sell property,

they could sell in payment of a debt, and could, consequently, transfer to trustees for the same object. *Union Bank vs. Ellicott*, 6 *Gill & John.* 371. *State of Maryland vs. Bank of Maryland*, ib. 216. *Catline vs. Eagle Bank*, 6 *Conn.* 233. *Savings Bank vs. Bates*, 8 *Conn.* 512. *Anderson & Wilkins vs. Tompkins*, 1 *Brock.* 461. *Brooks vs. Marbury*, 11 *Wheat.* 78. *Bank of Maryland vs. Ruff*, 7 *Gill & John.* 459, 465.

The directors of a bank can, at a meeting of a mere majority, by vote, order the President, who is one of them, to execute a power of attorney, constituting himself attorney in fact for the bank, to transfer notes and mortgages in payment of debts; and this gives the directory unlimited control over all the property of the bank. *Northampton Bank vs. Pepoon*, 11 *Mass.* 292.

The power of the Central Board was unlimited, except in the particulars in which it was restrained by the charter. *State vs. Ashley*, 1 *Ark.* 548. By means of its legislative powers, it represented the unity, sovereignty, and indivisibility of the corporation. *Id.* The directors bear the same relation to a corporation, as the legislature to a republic. 23 *Wend.* 123. 22 *Wend.* 91.

Directors of a bank are not such trustees as that they cannot appoint an attorney in fact, or delegate their control over the property of the bank. *Sturt vs. Mellish*, 2 *Atk.* 610. *Murray vs. Coster*, 20 *J. R.* 583. *Slee vs. Bloom*, 20 *J. R.* 683. *Shaw vs. Cunliffe*, 4 *Bro. C. R.* 145. *Atto. Gen. vs. Utica Ins. Co.* 2 *J. C. R.* 384. *Mayor, &c. vs. Lowton*, 1 *Ves. & Bea.* 228. 6 *Conn.* 244.

Nor is this a *delegation*, but an *execution* of power. It is appropriating the property of the bank to pay its debts.

The objection that the Central Board conveyed to themselves, is futile. Five of the trustees are liable to no objection on this score; and a trust is never allowed to fail on account of the disability of a trustee. *Sonley vs. Watchmakers' Company*, 1 *Bro. C. C.* 81. *White vs. White*, 1 *Bro. C. C.* 12. *Atto. Gen. vs. Downing, Amb.* 550. *Atto. Gen. vs. Barker*, 2 *P. Wms.* 125.† *Mogridge vs. Thackwell*, 3 *Bro. C. C.* 517. *S. C.* 1 *Ves. jr.* 475. *S. C.* 7 *Ves.* 36. *S. C.* 13 *Ves.* 416. *Ellison vs. Ellison*, 6 *Ves.* 663. *Pain vs. Archbishop of*

*Canterbury,* 14 *Ves.* 364.    *Wells vs. Farmer,* 1 *Mer.* 55.    *McCartee vs. Orphan Asylum,* 9 *Cowen,* 484.

If part of the trustees are incompetent, the only 'consequence is, that the Chancellor would displace them, and appoint others.    The deed is not, for that reason, invalid.    There are trustees who are competent to take, and they, having accepted, cannot renounce.    The Chancellor cannot decline the jurisdiction.    *Shepherd vs. McEvers,* 4 *J. C. R.* 136.    The creditors are entitled to affirm the trust.    *Neilson vs. Blight,* 1 *J. Cas.* 205.    *Moses vs. Murgatroyd,* 1 *J. C. R.* 119. *Shepherd vs. McEvers, ub. sup.    Cumberland vs. Codrington,* 3 *J. C. R.* 261.    *Willis on Trustees,* 199.    *Nutland vs. Eyre,* 2 *Ves. jr.* 94.    *Lake vs. De Lambert,* 2 *Ves. jr.* 592.    *Buchanan vs. Hamilton,* 5 *Ves.* 522.    *Uredale vs. Eltrick,* 2 *Ch. Ca.* 26.    *Bennett vs. Honeywood, Amb.* 710.    1 *Hilliard,* 241.

The objection that the trustees conveyed to themselves, is a mere technical, legal objection, as, that a man cannot sue himself.    But in this case, the corporation, which is grantor, and the stockholders and members of the Central Board, who are grantees, are entirely distinct persons in law.    *Pratt vs. Bacon,* 10 *Pick.* 126.    *Thomas vs. Dakin,* 22 *Wend.* 104.    *Warner vs. Beers,* 23 *Wend.* 103, 173.    The author of a trust may create *himself* a trustee.    *Lewin.* 15.

And it has been directly decided to be no objection, that a president and three directors, being a bare majority of a board of seven, ordered a deed to be made, appointing the president the attorney in fact of the bank, to transfer notes and mortgages in payment of debts. *Northampton Bank vs. Pepoon,* 11 *Mass.* 288.

The objection that the Bank was not *represented,* because, leaving out the ten members of the Central Board, who were made trustees, there was not a quorum remaining, and that these ten represented themselves, and not the Bank, is a mere plausible fallacy.

*Legally,* the Bank was represented, if she and the trustees were distinct persons in law, so that she could grant, and they take, by the same deed.

*Equitably,* she was represented, if they protected her interests, and were guilty of no fraud.

*Legally*, therefore, the objection is merely the technical one, that a party cannot be both grantor and grantee in the same deed.

*Equitably*, it is an objection to be determined by the consideration, whether the deed is, in its nature, provisions, and effect, fraudulent.

It is true, that an agent cannot be both *seller* and *buyer*. This is on the principle, that an agent, to sell, cannot act for his own benefit, to the injury of his principal. *Banks vs. Judah*, 8 *Conn.* 145. *Parkhurst vs. Alexander*, 1 *J. C. R.* 394.

Here the trustees do not *purchase*, nor take any beneficial interest. They remain *agents*, as they were before. The nature, kind, and terms of their agency are merely changed. They still act for the exclusive benefit of the Bank.

The principle goes no further, in its very utmost extent, than this, that a trustee, or agent, to sell, cannot *purchase*, and if he does, the sale is voidable, at the election of the principal.

The purchase must be absolute, and for his own benefit. Equity will consider him as holding as a trustee.

Suppose A is an agent, with power of attorney to sell a piece of property, or convey it in trust, to pay a debt of his principal. Suppose he executes a deed in the name of his principal, conveying to himself the property, *on the self same trusts.* Is it not good? He *represents* the principal, by seeing to his interests, carrying his wishes into execution, and taking on himself the trouble of the trust. There would be no *legal* objection to such deed. Would there be any in equity?

There is no law to be found any where, that a *debtor* cannot be made a trustee. Their debts are not extinguished by their appointment. Even the appointing of a debtor as *executor*, is no more than parting with the *action*, and the debt remains a trust for the creditors, or next of kin; and if there are not assets enough to pay the debts and legacies, the executor must pay his original debt, and his omission to do so is a *devastavit*. 3 *Bro. C. R.* 110. 19 *J. R.* 189. *Hall vs. Hall*, 2 *McCord, Ch.* 304. *Decker vs. Miller*, 2 *Paige*, 149.

Trustees are never responsible except in equity; no deed can make them responsible elsewhere. If a trustee owes the bank, and does not pay, the debt will become assets in his hands, and he will

not only be compelled to pay it, but be ousted. If his colleagues connive at his holding it, they will be equally responsible with him. 2 *Story Eq.* 229, 303, 525, 526, 527. 6 *J. C. R.* 1, 16. *Harden vs. Parsons,* 1 *Eden.* 145. *Brice vs. Stokes,* 11 *Ves.* 319. *Case vs. Abeel,* 1 *Paige,* 393. *Bruckenridge vs. Holland,* 2 *Blackf.* 377. *Myers vs. Myers,* 2 *McCord, Ch.* 265. *Mumford vs. Murray,* 6 *J. C. R.* 16, 452.

Trustees are never jointly liable, except for default, or connivance. In other cases, they are liable only for what they receive. 2 *Story Eq.* 520, 521, 522. 1 *P. Wms.* 83. *Pybus vs. Smith,* 1 *Ves. jr.* 190. *Leigh vs. Barry,* 3 *Atk.* 583. *Willis on Trustees,* 196. The provision of the deed, in this respect, is almost universally inserted in trust deeds. *Fellows vs. Mitchell,* 1 *P. Wms.* 81. *Bartlett vs. Hodgson,* 1 *T. R.* 42. *Kiss vs. Deniston,* 4 *J. R.* 26.

There was no need of any provision for surrendering or paying over the residue of the property, after payment of debts. The law implies that, and creates a residuary trust. 2 *Story Eq.* 413. 3 *P. Wms.* 20. 7 *Ves.* 425, 435.

There was no legal necessity for a bond to be given.

The word "heirs" is always used in such deeds, in order to convey the fee. The trustee can convey no greater estate than he receives.

In all corporations, a majority of the stockholders govern, in all cases. *Gordon vs. Preston,* 1 *Watts,* 385.

A majority have ratified this deed. "*Omnis ratihabitio retrotrahitur, et mandato priori equiparatur.*" *Story on Agency,* 235.

Though the deed might be disaffirmed, and set aside by creditors, it is still good, as between the assignor and assignee. *Mills et al. vs. Argall et al.* 6 *Paige,* 577.

That the power was legally given to the trustees, to fill vacancies in their own number, is clear. *Willis on Trustees,* 144. *Sharp vs. Sharp,* 2 *B. & A.* 405. *Webb vs. Earl of Shaftsbury,* 7 *Ves.* 480.

It was proper that the compensation to the trustees should be fixed in the deed. It was matter of agreement at the creation of the trust, and if made in good faith, will not be disturbed. No person can interfere as to this, unless the allowance is so disproportionate to usage,

and the nature of the service, as to be evidently a colorable disposition of property to defraud creditors. *Hendricks vs. Robinson,* 2 *J. C. R.* 216.

A trustee is not entitled to commissions on sales of the trust estate, or to any compensation for his care and pains in executing the trust; but he is entitled to an allowance *per diem* for his time, and expenses of travel, &c. *Green vs. Winter,* 1 *J. C. R.* 27. *Manning vs. Manning,* 1 *J. C. R.* 527.

A corporation is not dissolved, or its charter forfeited, by a surrender or sale of all its visible property. *Brinckerhoff vs. Brown,* 7 *J. C. R.* 225.

The *Resolutions* could not vary the effect of the deed. No assent of the creditors was necessary, nor any execution by the trustees. The moment the deed was made, the right of property passed, and vested in the assignees, and the relation of trustee and *cestui que trust,* as between them and the creditors, was at once constituted, so that the assignor could not recall the deed. *Cunningham vs. Freeborn,* 1 *Edw.* 262. *Ellison vs. Ellison,* 6 *Ves.* 656. *Bunn vs. Winthrop,* 1 *J. C. R.* 329. *Brooks vs. Marbury,* 11 *Wheat.* 78.

The assignment was perfectly good, without all the trustees assenting. *Nicholson vs. Wardsworth,* 2 *Swanst.* 370. *Adams vs. Taunton,* 5 *Mad.* 438. *Bonefant vs. Greenfields,* 1 *Leon.* 60. *In the matter of Stevenson,* 3 *Paige,* 420. *King vs. Donelly et al.* 5 *Paige,* 46. *In the matter of Schoonhover,* 5 *Paige* 559.

That *assignees* have not executed the deed, or entered into any covenant to perform the trusts, is no objection. These are mere formalities. If the assignee had accepted the trust, is ready to take possession, and enter on the performance of the trusts, he is as much bound as if he had covenanted. *Cunningham vs. Freeborn,* 1 *Edw.* 261.

Moreover, where assignees do not assent at the time, but afterwards, their assent *relates* to the time of the executing the deed. In no view, therefore, does the execution of the deed, by the Bank, depend on its execution by the trustees. *Wilt vs. Franklin,* 1 *Binn.* 518.

Where a deed or lease is made to be executed by two, the cove-

41

nants in it are binding on one who executes it, though the other, who was intended to be a party, never executed it. *Adams vs. Bean*, 12. *Mass.* 142. *Cutter vs. Whittemore*, 10 *Mass.* 442.

*Cummins & Ashley*, contra.

That the deed is void, and an absolute nullity, vesting no right whatever in the assumed grantees, we think clear, on two grounds:

1st. That there were not proper parties, or no parties at all.

A *majority* of the Central Board of the Real Estate Bank, which majority had full power to control the action of the Board, and to exercise, on behalf of the Bank, all the powers belonging to said Board, prepare the deed, fix its provisions and details, and do this for the Bank; but, at the same time, they act for themselves, and on their own behalf, as grantees, and claim to take the estate by the deed made by themselves. Such an act surely cannot be found on record. If the Board had possessed the power to convey the estate, and the conveyance had been made to less than a majority of the Board, a majority being left to represent the Bank, there might have been the semblance of legality in it; but, when a majority of the Board were acting for themselves as grantees, and taking the estate, and agreeing to the terms on which they would take, no quorum of the Board was left to represent the Bank. There was, in truth, no Board. The Bank could only act through agents, not *per se.* Her agents leave her, and act for themselves. In this pretended contract, the Bank was unrepresented; was no party; made no grant; and no right vested in the assignees. See 22 *Wend.* 37, 70, 104; *Angel & Ames on Corporations*, 129, 130, 139; *Com. Dig.*, title " *Fait;*" *Bac. Abr. Deed*, *&c.;* 2 *Cranch*, 127; *Head vs. Providence, &c.*, 1 *Conn. Rep.* 371; 6 *Wheat.* 593; 5 *Conn. Rep.* 196; 4 *Peters*, 514; *Providence Bank vs. Billings & Pitman*, 4 *Peters*, 152; *Beatty. vs. Knowles; Angel & Ames, &c.* 149, 150, *&c.*, 163, 166, 169.

2d. That, under the charter, the Central Board have no power to make an assignment. Being mere agents for specified purposes, and with strictly limited powers, no such transfer could be made, violating the legal possession of the Bank and its assets, by its owners and proprietors, destroying their power to use, govern, and take care of the

same, which rights are secured to the proprietors by express legal provision. *Angel & Ames on Corporations, power of directors,* &c., 139, &c., 2 *Peters,* 536; *Bank United States vs. Owens and others,* 2 *Cowen,* 664, 678, 699; *New-York Firemen's Insurance Co. vs. Ely,* 15 *J. R.* 383; 6 *Cranch,* 199; 7 *Cowen,* 604; and the cases referred to in case *Real Estate Bank vs. Dawson and others.* This Board has a mere legislative authority, and no power to transfer. The Bank can only act through its agents. When the agents are not authorized to do the act by the bank, it cannot be done.

In an equitable point of view, this deed would be esteemed void by a chancellor, on the grounds that it is a direct fraud, in violating the rights of the State and stockholders, to govern, keep, and use the assets of the bank, through their agents, to be appointed by themselves annually.

The Central Board being mere trustees, admitting that they had, as a board, power to transfer the whole assets of the Bank, with possession and legal interest in themselves, could not transfer to themselves, as they have done in this instance. This deed, thus made, is unquestionably void. See *Lewin on Trusts and Trustees. Law Library, new series, No.* 22; *Whole, No.* 70, *April,* 1839, *p.* 9; *marginal page* 16, *p.* 13, *p.* 39: (this shows the rule for construing the powers of the Central Board); *p.* 44, *p.* 69, (power of Central Board), *pp.* 119, 130, 132, 133, 146, 135, 153, 156, 157, 160, 162, 188, 190, 191, 192, 203, (power of Central Board), *pp.* 209, 218.

No crisis is shown or pretended, to justify the assignment of the $2,200,000 of assets. They do not show the amount of debts now due, but the deed shows, and the laws show, that the principal debt of the Bank, the 1500, or upwards, of State bonds, ($1,530,000), is not due short of about 20 years. Why now assign assets to pay these bonds? Can any reason be given? None is offered. All decisions show, that assignments alone are to be justified, even those of partners, on the grounds of present emergency, present indebtedness, never on the grounds of future and immature liabilities. Why are the funds appropriated by this deed and taken out of legal custody 20 years in advance? Can these assignees be permitted to decide for the State and stockholders, that they, the said trustees, ought to have

the management of the funds, and that they can better manage the said funds than the State and stockholders? This would be a new jurisdiction, and one which we think a court of equity could not recognize. The assumption of the control of these funds is unsupported by any authority expressed in law, or presumed by courts of equity. The assignment of so much as is reasonably sufficient to pay the debts due at the time of the assignment, is alone justified by courts of equity.

The statute of Maryland, referred to, states that deeds, executed by corporations in that State, according to the directions of the act, "shall be deemed and construed, in law and in equity, as valid and effectual, and of as much force in conveying, mortgaging, selling, assigning, transferring, and releasing any estate, right, title, interest, or claim, therein expressed, or therein intended to be conveyed, aliened, mortgaged, sold, assigned, transferred, or released, as if such deed had been or were duly executed and acknowledged by any individual citizen of this State, having or being seized," &c.

What was the intention in passing this law? Was it not to give the same effect in law and equity to the deeds of corporations as to the deeds of individuals? Does it not provide a means by which corporations can make as good deeds and valid assignments as individuals could? This is the avowed object. The deed of the corporation is declared to be as good as that of a citizen. The deeds of corporations are to every purpose made good and available. When they can make such deeds, is not the power given to make them? Surely this cannot be denied. Then the act confers the power to make the deeds, by declaring when made they shall be as good as the deeds of every or any citizen.

Again, the enactment is evidence that, without such law, corporations could not make valid deeds. The validity of the deed, and its effects in law and equity, are its essential existence. The act of Maryland confers on those deeds their vital principles and effect. Has this deed before the Court vitality and effect conferred on it by the laws of Arkansas? No law is shown here, as in Maryland, and none can be shown. This deed, then, as we contend, has neither vitality nor legal and equitable effect or power before this Court.

It never was contended, on the argument of the quo warranto case,

that the Central Board possessed any powers to set aside the provisions of the charter; no general powers beyond the execution of the declared rights of the charter were ever contended for; no specific power claimed for the Central Board, in that case, beyond the expressed purposes of the charter, has been, or can be, stated. The decision in the quo warranto case expressly declares, that the Central Board is limited in its action by the provisions of the charter. How can it be claimed that under this decision, the Central Board can annihilate the charter, destroy the rights, possession, and control of the State and stockholders, when the decision expressly points to the charter as a boundary, and inflexible rule of action for the Central Board? This effort is remarkable, because the authority is denied by the decision it is claimed under.

The charter expressly puts the funds in keeping and control of the local boards. They have the legal holding. How can this be broken and destroyed by the Central Board, unless according to the charter? No authority is shown. The power to settle the general accounts of the Bank is given to the Central Board. Their exercising this power does not destroy or interfere with the other powers given to the local boards. Each local board is limited to its special grants of power, and each must keep within its own orbit. But it is claimed that the power to settle the general accounts is so large as to destroy all power of the local boards. No argument is necessary to show that the power of the local and central boards can exist together, and they must be so exercised.

[The argument in response, will be found in the appendix to this volume.]

By the Court, LACY, J. This is an application in behalf of the trustees of the Real Estate Bank of the State of Arkansas, asking this Court to issue a peremptory *Writ of Mandamus*, directed to the Judge of the Fifth Judicial Circuit, commanding him to grant an *injunction* against certain named persons, who constitute a majority of the local directory of the Principal Bank, restraining them from further intermeddling with the property and assets of the corporation. The ob-

ject of the bill is, to have the trust estate established, by coercing the surrender and delivery of the property and effects of the Bank into the hands of the trustees.

The application is founded upon a petition, regularly sworn to, and filed in the names of all the trustees, except Carey A. Harris, who has departed this life since the execution of the trust; to which is annexed the bill of complaint that was submitted to the Chancellor of the Circuit Court, and upon which is endorsed his refusal to award the injunction, for want of jurisdiction.

The first question to be determined is, has this Court the power to issue a mandamus in such a case? The general jurisdiction of the Supreme Court is unquestionably appellate, and co-extensive with the State, and most of the writs that it is authorized to issue, are in aid of its appellate powers. Still, it has undeniable authority to issue other writs, as a portion of its original constitutional jurisdiction; and among these, the writ of mandamus is specifically named, and fully provided for. The power is given to this Court to issue such a writ, by express grant of the constitution; and the Court is invested by that instrument with a supervising power and control over all inferior courts of law and equity. The due exercise of these powers is indispensable, in maintaining the supremacy of the authority of this Court, and for preserving a consistent uniformity of action among the inferior judicial tribunals. It has been the constant and invariable practice of this Court, to issue writs of mandamus, whenever the party applying for them showed that he was legally entitled to their benefit, and to direct them either to ministerial or judicial officers. When addressed to judicial officers, they can only be executed in term time; but, when addressed to ministerial officers, they may be executed at any time. The distinction between a ministerial and a judicial act, as contemplated by the constitution, is laid down and explained by this Court, in the case of *Toby and others vs. Bower*, 3 *Ark.* 351. Whenever the writ operates as an auxiliary process, to bring the parties or subject matter in dispute before the Court, the acts of the officers issuing these writs are said to be ministerial; and this holds true in such cases, although, in granting or refusing them, the relative rights of the parties may be seriously affected, and incidentally decided; still, it is the

exercise of ministerial discretion, and not of judicial judgment; such, for instance, as a clerk's issuing an execution, a sheriff's taking a delivery bond, a justice of the peace awarding an attachment, or a judge of a circuit court issuing a *ne exeat*. Now, should these writs be denied a party, when it was lawful for him to have them, this Court would interfere by mandamus, and compel their emanation. And it would do this upon the principle, that the party shows himself to have a specific, legal, vested right, and no other specific and adequate legal remedy. The issuing or refusing of an injunction, is but the exercise of a ministerial discretion. It usually includes a higher degree of discretion, than the issuing of the other writs that have been put by way of example. The issuing of an injunction is sometimes said to be a remedial, and sometimes a judicial process; but in no sense can it be affirmed, that its issuance or refusal is the exercise of that kind of judicial power, which was contemplated by the constitution, and which, as this Court has said, consists " in the distribution of justice by a legal trial and determination of the suit." To grant or to refuse an injunction, can, in no sense, be said so to operate, as to try and determine the matter between the parties. It only brings the question of right and equity before the Court, to be decided by future adjudication; and hence, the uses of the writ are either preventive or restorative. The granting or refusing of an injunction being, then, the exercise of a mere ministerial discretion, and the constitution, and the laws, in establishing and organizing the circuit court system, having given this power expressly to these tribunals, in term time, and to the judges in vacation, it therefore necessarily follows, that, if the injunction has been improperly refused, this Court will award a peremptory mandamus to the judge, commanding him to grant the writ.

This brings us to the consideration of the second question, which is, taking the allegations of the bill to be true, (and the Chancellor was bound so to consider them), had he equity jurisdiction of the case?

The equity of the bill depends upon the validity of the assignment, and the allegations and exhibits made in support of it. The bill is filed in the name of all the trustees; ten only having signed the deed,

and executed bonds for the performance of the trust. The true ob-
ject and intention of the bill are perfectly apparent. The right of
property, as well as possession, is claimed to belong to the trustees;
and they come into equity for its aid and assistance, in protecting and
establishing the trust. The allegations of the bill, in some respects,
are not very precise or accurate in the details; but all the important
and substantive facts are stated with sufficient clearness and distinct-
ness, so as to leave no doubt as to the true object and design of the
complainants. The bill shows that, upon the execution of the trust,
the trustees obtained possession of the property, and that afterwards,
it came into the hands of the defendants, who are charged, in express
words, "as being members of the local directory of the Principal
Bank," and that *"they constitute a majority thereof,"* and that they
"refuse to deliver over the property and assets of the Bank to the
trustees, or to permit them to receive, or *control the same*, or *perform
the trust."* The bill further alleges, that they will neither make, or
permit to be made, a schedule of the property and assets of the Bank,
and that they are determined to hold the property illegally and vio-
lently. We understand this charge to mean, not only that the de-
fendants are now holding the trust estate illegally, but that they will
so continue to hold it, if not restrained. The defendants are said to
resist the deed of assignment, solely upon the ground that it is fraudu-
lent and void, and, therefore, conveys no title or interest to the trustees.
If these averments do not charge them with doing these acts, as a
majority of the directory of the local Board of the Principal Bank,
then we are unable to perceive how any terms or words can make
such an allegation. The trustees declare that they claim under the
deed, and that defendants claim by virtue of the authority they pos-
sess, as a majority of the local directory. It is only in their capacity
as a directory, that it can be pretended they can set up any right to
the possession or property of the Bank; for if its custody and man-
agement do not belong to the trustees by the assignment, then it is un-
deniably true, that it appertains to the central and local boards of the
corporation. It is equally clear, that the trustees seek to have the
trust established, because they allege that a majority of the local
board will not permit them *to perform the trust*, by refusing them the

management and control of the assets of the Bank. Besides, the injunction is prayed for upon " the express ground that the trust may be established, and the trustees protected and aided in the performance , and discharge of the duties thereof." If this language does not seek the establishment and performance of the trust, we should like to see any other mode of expression adopted, more significant or exact. Again: the defendants are asked to be perpetually enjoined and restrained from further intermeddling with any of the property, effects, or assets of the Bank, assigned and transferred over to the trustees. It is surely as a majority of the local directory, and not as private individuals, that the defendants are charged with refusing to furnish a schedule of the property and assets of the Bank, or ot permit one to be made out. The same remark is equally applicable and true, when the bill seeks to enjoin the defendants from further intermeddling with the property and assets of the Bank; for, as private persons, these defendants (according to the statements of bill and exhibits,) do not set up any title or claim whatever to the property and assets in dispute. The acts of the defendants, the bill alleges to be illegal; and it states, that they have a tendency to defeat the objects and purposes of the deed; to delay the creditors of the Bank, and to depreciate the paper; to prevent the collection of her debts, and seriously prejudice the rights of the stockholders, and of the State. We have been thus particular in quoting, literally, the language of the bill, that its real object and design could not be mistaken—which are, to have the trust established; and that can only be done by causing the property and assets of the Bank to be surrendered into the hands of the trustees, and put under their management and control. We think that we have sufficiently demonstrated these two propositions: first, that the complainants have come into equity to have the trust estate protected and established; it seems to us to be a self-evident proposition, that the trust estate can neither be protected nor established, unless the property and assets of the Bank are put into the possession, and under the control, of the trustees, without molestation or interruption. Second, that the defendants are charged by the bill as constituting a majority of the directory of the Principal Bank, and not as private persons.

42

The jurisdiction of the Court may possibly be called in question upon another ground, which we deem it proper to notice. It is this: that admitting the deed to be valid, still the trustees are not entitled to the possession of the property, as only ten of them have signed the deed, their right of possession depending upon the precedent condition, that all of them shall execute bonds before the estate could vest. The error in the proposition stated consists in this: that the principle in dispute is assumed to be true, which we utterly deny; and we ask to be pointed to the proofs, to show that the execution of the bonds of all the trustees is a precedent condition to the vesting of the right of property and right of possession. The deed, certainly, declares no such thing. The assignment vests the property absolutely in the trustees, *in presenti*, by proper terms and appropriate words, immediately upon its execution. How, then, can the execution of the bonds be said to be a condition precedent? That principle is forbidden by the very terms of the deed itself, which declare, that the estate shall vest and pass into the hands of the trustees the instant it is executed, and be held for the payment of the debts of the corporation, according to the provisions and limitations of the deed.

That some of the trustees have not executed the bonds required by the deed, we regard as a matter of no importance. We consider it perfectly plain, that the execution of the bonds is not, technically, a *condition* either *precedent* or *subsequent*. It is a mere *stipulation*, a duty imposed on the trustees, like the other duties created or imposed by, or growing out of, the deed; for there are certain words proper to make a condition, and which distinguish a condition from a *covenant* or *stipulation*. The words "upon condition," are the most appropriate expression, or the words may be "*so that*," "*provided*," "*if it shall happen*," &c. *Co. Lit.* 203 a. b. *Litt. sec.* 325, 330. *Mary Portington's case,* 10 *Co.* 42. *Lord Cromwell's case,* 2 *Co.* 69.

If it be doubtful whether a clause in a deed be a covenant or a condition, the courts will incline against the latter construction. 4 *Kent,* 132. If a man make a feoffment in fee, *ad faciendum,* or *faciendo,* or *ea intentione,* or *ad effectum,* or *ad propositum,* that the feoffee shall do or not do such an act, none of these words make the estate in the land conditional; for in judgment of law, they are no words of

condition. *Co. Litt.* 204 *a.* The words, " if it happen," do not make a condition, unless followed by a clause of re-entry. 2 *Hilliard*, 363. A conveyance to a person, " he erecting buildings," &c., is not a conveyance upon condition. " Paying and yielding rent," &c., " paying and performing," &c., never constitute a condition, unless there is a clause for re-entry. There must be technical words to make a condition. 8 *Cowen*, 296. 2 *Show.* 202. 1 *Sid.* 280. 2 *Mad.* 35.

Moreover, admitting the provisions in regard to the execution of bonds to be a condition, it is a condition subsequent, and not precedent. It will be here remarked, that this question has no connection with that large class of cases in which *executory* covenants are discussed, and in which cases the question has most commonly arisen whether covenants were dependent or independent. This is not such a case. It is not a contract *executory* for a conveyance *in futuro*, but an executed contract; a deed with words of conveyance absolute and *in presenti.* A condition is " a qualification or restriction annexed to a conveyance, by which, upon the happening or not happening of a particular event, or the performance or non-performance of some act by the grantor or grantee, an estate shall commence, be enlarged or defeated." 1 *Hilliard*, 247. 4 *Kent*, 121. 2 *Cruise*, 4. And the rule by which to determine whether a condition be precedent or subsequent is, whether the thing is to happen before or after the estate is to vest. If before, the condition is precedent; if after, it is subsequent. *Doe vs. Scudamore*, 2 *B. & P.* 298. If the particular clause in question, or the whole instrument, shows that the condition must be performed before the estate can vest, the condition is precedent; but if the act prescribed does not necessarily precede the vesting of the estate, but may accompany or follow it, the condition is subsequent. *Finlay et al. vs. King's Lessee*, 3 *Peters*, 374. Examples of a condition precedent are, where an estate is limited to A., to vest on his marriage; and where a lease is made to commence on a certain day, on condition that B. pay a certain sum of money within that time. 4 *Kent*, 125. A condition precedent must expressly delay the vesting of the estate, until performance of the condition, and we know of no authority conflicting with this rule. In determining whether a con-

dition be precedent or subsequent, the *intention* is the only thing to be considered. Though the words might seem to make a condition precedent, yet, if the intention is otherwise, this will govern, and not technical terms or the collocation of the words used. 3 *Com. Dig.* 88. *Hotham vs. E. Ind. Co.* 1 *T. R.* 638. *Worsley vs. Wood,* 6 *T. R.* 710. *Howard vs. Turner,* 6 *Greenl.* 106.

In *Green vs. Thomas,* 2 *Fairf.* 320, the Court say, " whether a condition is precedent or subsequent, must be determined by the intention of the parties; and not upon technical terms or the collocation of the words. The stipulation, *that the grantee shall come into immediate possession,* seems to have been introduced for the express purpose of avoiding the construction that he was to have nothing until the conditions were performed. He was to have immediate possession upon the conditions expressed." So in *Finlay et al. vs. King's Lessee,* the Supreme Court of the United States said, in regard to a will, " The testator has expressed clearly his intention that the lands encumbered with his wife's estate should come to the possession of William King, at her death. He gives the estate at that time, without requiring that the conditions annexed to it should be previously performed. The estate then vests in possession, whether the condition on which it was to depend, be or be not performed. *It cannot be supposed to have been his intention that the devisee should take possession under this devise, before the interest vested in him.* The interest, therefore, must have vested previously, or at the time."

These two cases, without further authority, would settle this question. This deed is absolute in its terms. It conveys the property *per verba de presenti,* and vests it in the trustees unconditionally. The property passed and vested in the trustees, by force of the language of the deed, *at once.* The relation of trustee and *cestui que trust,* between them and the creditors, was at once created, and the Bank could not recall the deed. *Cunningham vs. Freeborn,* 1 *Edw.* 262. If the trustees fail to give bond, this cannot deprive the creditors of their rights under the deed. Moreover, in the language of the Supreme Court of Maine, the provision in this deed, which provides, *that possession of all the assets of the Bank shall be given to the trustees immediately on the execution of this deed,* seems to have been intro-

Conway et al., *Ex Parte*.

duced for the express purpose of avoiding the construction, that the trustees were to take nothing until they should execute their bonds; and, in the language of Chief Justice MARSHALL, the Bank has clearly expressed her intention that the property should come to the possession of the trustees immediately on the execution of the deed. The deed provides that possession shall be taken "*immediately*," without requiring that the bonds shall be *previously* executed. The estate vests in possession whether they be executed or not. It cannot be supposed to have been the grantor's intention, that the trustees should take possession under the deed before the interest vested in them.

Again: a covenant to be performed without limitation of time cannot be a condition precedent to another covenant. *Barksdale vs. Toomer*, 2 *Bailey*, 180. So, another rule is, that if an estate is given on a condition, for the performance of which no time is limited, the party has his life for performance; or, as the authorities hold, he is bound to perform in a reasonable time. Such a condition can never be a condition precedent. 3 *Peters*, 374. Where a prompt performance of a condition is necessary to give the feoffor the whole benefit contemplated to be secured to him, or where its immediate fruition formed his motive for entering into the agreement, the feoffee shall not have his lifetime for a performance, but only a reasonable time. *Hamilton vs. Elliott*, 5 *Serg. & R.* 384. Where the condition is to do a transitory thing, without limiting any time, it ought to be done in convenient time. *Co. Lit.* 208 *a.* 1 *Rol.* 1, 15 *to* 30. 6 *Petersd. Abr.* 67. 3 *Bibb*, 105. 1 *Bibb*, 461. 3 *Bibb*, 329. 3 *Mon.* 446.

It is, therefore, clear to our minds, that the provision, requiring the trustees to execute bonds, is not, at all, a *condition precedent*, but that, if a condition at all, it is merely a condition subsequent; that the trustees are bound to give their bonds in a reasonable time; and, if they do not do so, it will be the duty of the Chancellor, on a proper application, to cause it to be done, or to remove such as are in default, and appoint others. The failure of any of them to give bond, cannot operate so as to re-vest the property in the Bank. It certainly requires the trustees to execute bonds, with sufficient security, to be

approved by three of the stockholders, but does it state when these bonds shall be executed or approved? or does the deed contain any intimation that the trust cannot vest until the bonds are executed? There are no express terms in the grant indicating such intention. Doubtless, the bonds would have to be executed for greater security and protection; but is the conclusion either rational or legal, that because there has been a failure upon the part of some of the trustees to execute the bonds, that therefore the estate does not vest, nor are a majority even entitled to receive it, although they have strictly complied with the condition of the assignment in this particular. In such a case, would a court of equity refuse to entertain jurisdiction upon the ground that all the trustees had not executed bonds, although two-thirds had? And must the omission or negligence of the co-trustees prejudice the rights of those who had done all to secure the the estate? And would such an obligation hold good against creditors and third persons whose rights had vested under the deed? Surely not. Would not a court of equity, if an application was made, permit those trustees, who had failed to sign, to come in and execute the deed, and file the necessary bonds? Most unquestionably it would; for, if this was not the case, then indeed courts of equity would act with greater strictness and technicality than even a court of law, which frequently allows a party to amend a defective bond for costs, and that, too, in cases after trial had, and while the suit is pending before a superior jurisdiction. The objection raises a precedent condition by mere inference and intendment, which, according to the view we have taken, is unconditionally disproved by the deed itself, and that, too, in the case of a trust estate, where it is shown that, if equity does not interfere, the trust estate must fail. But, it may be said, that the bill should have been only in the name of the ten trustees who had executed their bonds; and therefore the present suit must be dismissed for want of proper parties. And what, in the mean time, becomes of the trust estate? Is it to be left in possession of those who now claim to have its control and management? We think it was not at all necessary, to give validity to the deed, that the trustees should sign it; and this position is clearly demonstrable, both upon reason and authority. The resolutions that were passed by the

Conway et al., *Ex Parte.*

Central Board, after the deed was executed, could not vary or alter the legal tenor and effect of the deed of assignment previously executed. And if this be true, and there can, we apprehend, be no doubt about it, then it meets and answers the objection, that the trustees were not entitled to the possession of the property until the attorney of the Bank notified the local boards of the execution and approval of their bonds. Even if this proposition could be questioned, still the accidental or culpable negligence of the attorney could not prejudice the rights of the trustees, much less those of the stockholders and *cestuis que trust.* Such an allegation was wholly unnecessary upon another ground. It is expressly averred in the bill, that the defendants set up their claims, and base their right to retain the property, upon the exclusive assumption, that the deed was fraudulent. We lay down this general and unqualified proposition, that there was no necessity whatever for the trustees to have signed the deed, to make it valid, in the first instance; but any act done by them, which showed their assent, will make it obligatory, and equity will enforce the trust. And we feel confident, that no case can be found, impugning this doctrine in the slightest degree, unless it be a case where the deed, upon its face, contains express and imperative covenants, requiring the trustees to sign it, which cannot be pretended in the present instance. This, all the authorities prove; and, as we shall hereafter have occasion fully to consider and determine that point, we will now make no further comment upon it than barely to remark, that the bill shows, in the present case, that all the trustees have assented to take upon themselves the trust; and that there has already been transferred to them a large amount of funds of the Bank; and that they now ask the aid of a court of chancery to get the residue. As it was not necessary, then, for any one, much less for all, of the trustees, to execute the deed, and as they are all now present, urging its establishment, the suit is properly brought in their joint names. The moment the deed was executed, the relation of trustee and *cestui que trust* placed the estate under the jurisdiction of a court of equity, and, if there could possibly arise any difficulty upon the subject, that jurisdiction would still pursue the estate, and transfer the possession to the ten trustees, who were entitled to receive it, holding it for the

others to come in and execute the necessary bonds; and if they failed, in a reasonable time, to do so, would remove them from office, and cause others to be put in their places.

That a court of equity has full jurisdiction in this case, seems to us to be a proposition perfectly free from all doubt. The object of the bill, as before remarked, is, to have the *trust estate protected and established.* Can this be done while that estate is in the hands, and under the control, of others?

The cognizance of a court of chancery flows from the familiar and universally attested fact, that the establishment, enforcement, and protection of trusts, constitute one of the great original branches of equity jurisdiction.

Lord HALE considered that one of the two things which gave original jurisdiction to courts of equity, or at least contributed much to its enlargement, was the invention of *uses and trusts,* which were frequently necessary, especially in times of despotism, touching the crown. Lord COKE says, there be three things to be adjudged of in a court of conscience or equity, covin, accident, and breach of trust. *4 Co. Ins.* 84. And Justice STORY declares, that, in matters of trust and confidence, the ordinary courts take, in a variety of instances, no cognizance; and he adds, " positive law being silent upon the subject, courts of equity consider the conscience of the party bound for the performance of the trust, to prevent a total failure of justice." And so, while they compel the performance of trusts, they will assist the trustees, and protect them in the due performance of the trust, whenever they seek the aid and direction of the Court, as to its establishment, management, and execution. *2 Story's Equity,* 229. It has even been held, that the most appropriate remedy in all trusts, is to be found in a court of equity. And there may be cases, say the authorities, where a party might have an adequate remedy at law for breach of trust, but the cases are few, (if any exist); and we have been unable to find a single one where a court of equity has refused, upon that ground alone, to uphold the trust. *23 Pick.* 148.

The jurisdiction of courts of equity, if not created, was soon afterwards extended, for the purpose of protecting and enforcing the execution of trusts. *2 Fonb. B.* 1, *Ch.* 1, *sec.* 1, *note a.* Trusts, says

Conway et al., *Ex Parte.*

Justice STORY, that arise under general assignments for the benefit of creditors, are, in a *special sense,* the objects of chancery jurisdiction. 2 *Story's Equity,* 303.

It is a fundamental rule, that if, originally, the jurisdiction attached in equity, on account of any supposed defect of remedy at law, the jurisdiction is not changed or altered by courts of law now entertaining suits in cases where they were formerly rejected. The reason assigned is, that it cannot be left to courts of law to enlarge or restrain the powers of courts of equity. 1 *Story's Equity,* 81. *Atkinson vs. Lemond,* 3 *Bro. C. C.* 218. *Ex parte Greenway,* 6 *Ves.* 81. In *Garth vs. Cotton,* 1 *Ves.* 524, 526, Lord HARDWICKE is reported to have said, that is the duty of the trustees to *preserve the estate,* and every assistance will be granted by a court of equity in support of the trust, and to aid them in its due performance. These authorities unquestionably show, that courts of equity entertain jurisdiction to protect the trust, and that they will assist the trustees in its management and execution. Now, according to the authority of *Garth and Cotton,* equity makes it the express duty of the trustees to preserve the estate. If it is their duty to preserve the estate, how can they do this, unless they can acquire possession of the property? We ask, how is the trust to be protected or upheld, if the funds or assets that constitute the estate, are not delivered into their hands, and placed under their management? This is all that is asked for in the present instance. All the parties to the deed have an unquestionable right to have the trust executed. Certainly the creditors or stockholders could apply to a court of equity, for the purpose of having the trust estate, which was created by the deed of assignment, protected and established. Upon what principle could they come in? The inquiry gives the answer. Having an equitable interest in the deed, they have equitable rights to compel the trustees to execute it, and equity would hold the trustees bound for the faithful performance of the trust. Now, if they have an undoubted right to the jurisdiction of the Court, the trustees, whose duty it is to preserve the estate, have equally as unquestionable a right to relief. The trustees are not acting for themselves, but for the benefit of those very persons who are presumed to have assented to the deed; and upon this ground alone, the trustees

43

are entitled to the assistance of a court of equity, in the performance of their trust. If that were not the case, the entire fund might fail, and they be responsible for the loss. Would this be either just, or legal, or equitable, or conscientious?

It is no objection to the jurisdiction of a court of equity, that a party has a remedy at law, unless it be shown that the legal remedy is plain, direct, and complete. The remedy at law, to be adequate and complete, and attain the full end and justice of the case, must reach the whole mischief, and secure the whole right of the party in a perfect manner, *in præsenti* and *in futuro.* *Bacon vs. Leroy*, 4 *J. C. R.* 355. Courts of law deal with contracts as a violation of legal duty, and compensate the party for the injury sustained by way of damages. Courts of equity regard contracts in a wholly different light. They treat their breach as a violation of moral as well as of legal duty, and enforce their execution by acting upon the conscience of the culpable party. No one, we think, will hazard the assertion, that any other action at law, except replevin, would afford the trustees any remedy whatever. The inquiry now is, would replevin, under the peculiar circumstances of this case, give to the trustees a plain, direct, adequate, and complete remedy? If the deed be valid, the trustees are unquestionably bound to see that it be carried into execution. By the deed, the property became assets in their hands to be administered, and equity charges them with the execution of the trust. The interest of the creditors and the Bank will not permit the trustees to stand still, until a decision could be had at law, upon the validity of the deed; which, in the course of things, might and probably would be delayed for a considerable time. The estate, during this period, might be seriously injured. The trustees certainly cannot be required to proceed in the execution of the trust, so long as the question as to the legality of the deed remains undetermined. The trustees are entitled not only to the right of possession of the property, if the deed be valid, but to have the title to it settled as speedily as possible. Now, replevin would only give the present possession of the property, leaving the whole question of title to be determined thereafter by a court of equity; at least, as to the fraudulent intent of the deed in regard to the *cestuis que trust.* Does the action of replevin, in such a case, afford

a complete as well as adequate remedy, and will it reach the whole mischief of the case, and answer, in a perfect manner, the ends of justice? It certainly would not. Again, trustees being bound for the execution of the trust, of course equity will free them from all onerous burdens and impediments of every kind. It may well be doubted whether the trustees could be required to enter into the necessary bonds, with security, to obtain possession of the property by replevin. Unless they bound themselves, with sufficient security, in double the amount sought to be replevied, (which, in this case, would be exceedingly large), of course they could not get possession of the property. The statute makes the execution of the necessary bonds an indispensable pre-requisite to obtaining possession of the property. Suppose they could not give the bonds, must the trust fail on that account? They have no interest in the matter, except the mere compensation allowed them for their services. Would it, then, be just or reasonable to bind them in such heavy responsibilities, in order that they may administer the trust that equity puts in their hands? If they are entitled to the possession of the property and assets of the Bank, it is because the estate vested upon the execution of the deed, and it cannot be encumbered with any other conditions than those contained in the assignment. The Chancellor gives them the property, if they are entitled to it, according to the provisions of the deed, without any improper let or hinderance whatever. But how is it possible for the trustees, in this instance, to sue out replevin? The bill expressly charges, that the local directory will not make out a schedule of the property and assets of the Bank, nor permit it to be made out; nor will they permit the trustees to have access to the books of the Bank, for that purpose. The property and assets of the Bank consist of a great number and variety of choses in action, and other securities, incapable, under the state of case shown, of being described, and therefore could not be replevied. How, then, can the action of replevin afford a plain, direct, adequate, and complete remedy?

A court of chancery will interfere by injunction, where the remedy at law is doubtful or difficult. *American Ins. Co. vs. Fisk,* 1 *Paige,* 90. *Weymouth vs. Boyer,* 1 *Ves. jr.* 416. *Rathbone vs. Warner,* 10 *J. R.* 595. *Hanson vs. Gardner,* 7 *Ves.* 308. *Norway vs. Rowe,*

19 *Ves.* 147. Would the remedy at law here be free from doubt or difficulty? We certainly think it would not. Then, on this ground also, equity would have jurisdiction.

Equity would entertain jurisdiction upon another ground: it will always interfere to prevent a multiplicity of suits. In *Keys vs. Brush*, 2 *Paige*, 311, which was a case where the defendants had failed to comply with their obligations to make out an inventory of the assigned property, it was held that the trustees might come into equity for discovery, and coerce the delivery of certain books, and other securities. If it was not beneath the dignity of a court of equity to interfere, and compel the delivery of an heir-loom, a jewel, a picture, of family slaves, and the like, as the cases of *Fells vs. Read*, 3 *Ves. jr.* 70. *Pusey vs. Pusey*, 1 *Vern.* 273; *Walwyn vs. Lee*, 9 *Ves.* 24; *Lloyd vs. Loaring*, 6 *Ves.* 772; *Lowther vs. Lowther*, 13 *Ves.* 95; *McRea vs. Walker*, 4 *Howard*, 456, all unquestionably prove, then, indeed, it would be strange, if it would not protect trustees in an estate, where millions are involved; and where property of a peculiar, transitory nature, is required to be collected and administered by the trustees, as speedily as practicable, in order to preserve the trust estate. In the class of cases just mentioned, Lord BACON, in his celebrated ordinances, says, it has been the constant and invariable practice of courts of equity to grant relief, by decreeing a specific execution of the chattel, from time immemorial. And in the case of *Harrison el al. vs. Rowan*, 4 *Wash. C. C. R.* 202, there was a bill filed by the trustee with others, claiming the benefit of the trust created by devise, to have the will established, that the trustee might be put in possession of the land, with the muniments of title, for the purpose of executing the trust. Objection was made to the jurisdiction of the court, because the remedy by ejectment, and other actions at law, was said to be complete. Justice WASHINGTON, in responding to the objection, said, that there was a number of cases in which a concurrent jurisdiction was exercised by the two courts; and that in many of them, the ground of the equity jurisdiction is not, that the common law courts are incompetent to afford a remedy, but that such remedy is less complete than a court of equity, from the nature of its organization, is capable of affording: that where a case is otherwise proper for the

Conway et al., *Ex Parte.*

jurisdiction of a court of equity, it is no objection to its exercise, that the party may have a remedy at law; and that the inquiry always is, *whether the case is within any of the general branches of equity jurisdiction, as claimed and exercised by the court.* The application of the principle here stated, puts for ever at rest the question of jurisdiction. The remedy at law, in the case cited, is far more adequate and complete, than it ever could be made to be when applied to the one now before the court. In both cases, the trust estate is sought to be protected and established, and the possession of the property to be surrendered to the trustees, to preserve the estate.

The prayer of the bill is, " To the end, therefore, that the trust may be established, and the complainants protected and aided in the performance and discharge thereof," that the defendants "be perpetually restrained from further intermeddling with any of the property, effects, or assets of the Bank, assigned and transferred over to the trustees." We hold this prayer to be tantamount to a prayer for the surrender and delivery of the property, effects, and assets of the Bank to the trustees. The trust cannot be established without the surrender and delivery. How can the assets be collected or administered, according to the deed, and applied in payment of the debts of the Bank, unless the trustees are put in possession of them, or have their control and direction? It is clear that the trustees and local directory cannot have the possession and direction of the property and assets, at one and the same time; one or the other of them must be entitled to the entire possession, or absolute control. The local directory, according to the charter of the Bank, never had any thing but a qualified possession or control over the property and assets of the Bank, always subject to the will and government of the Central Board. This Board, which represents the corporation, has, by its deed of assignment, transferred the property and possession to the trustees, who claim by virtue of its authority. This arrangement, if it be good, supercedes and annuls the jurisdiction of the local boards over the assets and funds of the Bank, and they have no other powers except what are retained by the deed. Again: the trustees can neither be protected or aided in the performance or discharge of their duties, unless the property and assets of the Bank pass into their possession,

and are put under their control. The bill prays that they be protected and aided in the performance of their trust duties. If they are entitled to this relief, can it be extended to them, while the property and assets remain in other hands? How can they proceed to collect the assets, pay the debts of the corporation, or receive renewals of the notes of the debtors, or do any other act required by the deed, when the means by which these things are to be performed, are withheld from their possession, and not liable to their government. Beside, they have already obtained possession of the property and assets of two of the Branches, and two more are making the necessary preparation for delivery and surrender; and the trust, to a considerable extent, has already been carried into operation. But a majority of the directory of one of the local boards refuse to surrender up the property and assets. Now, if they have a right to the possession and control of the funds and assets of their Branch, then we should have the strange anomaly presented, of the trustees administering the property and assets of the corporation, belonging to two or four of the Branches, as the case might be, and the local directory of the Principal Bank administering the funds and assets of their Board. If such a state of things is allowed, the interest of the State, the creditors, the stockholders, and the corporation itself, would all be equally prejudiced. A large amount of means appertaining to all these parties, would, in this conflict of authority, be wasted and destroyed. Is it just or reasonable, taking the deed to be valid, that one-fifth part of the local directory can defeat the objects of the other four parts, and overthrow the entire will of the corporation itself? While this controversy, in regard to the matter, is going on, it is clear, to our minds, that the possession of the property and assets of the Bank must remain, and be, either with the trustees or local board. One or the other is, unquestionably, entitled to it. To direct it to be placed in the hands of a third party, to await the ultimate decision of the cause, would be, to abstract the whole amount of assets in dispute from the use of the corporation, in the payment of its debts; and this would, necessarily and inevitably, produce great inconvenience and loss. Has a court of equity power to interfere, in such a case, to preserve the trust estate? The peculiar and transitory nature of the estate;

the absolute necessity that exists for the possession of the assets being confirmed, and put under the management of one or other of the contending parties, conclusively prove, that a court of equity, having all these facts before it, ought to make such an order in the case as will preserve the estate. And we cannot perceive how the trust can be protected or established, unless the assets and property are under the control and management of the trustees. Besides, judging from the agreed facts in the case, it seems to us to be the aim and desire of both the contending parties to test the validity of the deed, and that the right of possession should follow the right of property. These facts are upon the record, and they demonstrate that the defendants claim as a majority of the local Board. The resolutions of the Central Board, passed after the assignment was executed, were introduced by the defendants as evidence, for the purpose of showing, that they were not regularly notified of the execution of the bonds of the trustees, and that, therefore, they, as a local directory, were not bound to recognize the assignment. This evidence certainly shows the character in which they claim to hold, and their willingness that their title to the property should determine the possession. Again: these defendants, by introducing an agreed statement upon the record, that ten of the trustees were largely indebted to the Bank, clearly manifested their intention to attack the deed upon the ground of illegality and fraud, and not to contest the right of possession, unless the deed should be adjudicated to be void and fraudulent. The bill charges, that they resist the authority of the trustees, upon the ground that the assignment is void; and the evidence introduced by them, as far as it goes, corroborates and confirms the idea. The bill, then, does not stand alone, but is aided, in this particular, by the admitted facts in evidence, upon an agreed case between the parties, from which, it appears to us, that the right of possession is a secondary consideration, and made to depend and turn upon the authority and power which the respective parties were entitled to exercise over the management and control of the assets and effects of the Bank.

The effect of perpetually enjoining and restraining the defendants from further intermeddling with the property, effects, and assets of the Bank, necessarily places them in the hands of the trustees, and, there-

fore, there was no necessity for a general prayer for relief, or for a particular prayer that they be surrendered and delivered up. The very moment these defendants are restrained from all further intermeddling in the matter, thereupon the whole property, effects, and assets, which they claim to manage as a majority of the local directory, pass, and are transferred, according to the deed of assignment, and that gives the right of possession and property, agreeably to its provisions and limitations. We know of no rule in equity, where the facts are all before the court, and rightfully placed by the pleadings, that will prevent the chancellor from doing justice and equity in the premises. If the party should even fail, in his specifications, to ask for what he is entitled to receive, still, if the facts and statements in the bill authorize the general prayer, as made, and that necessarily includes the relief sought to be obtained, of course the chancellor is bound to afford it; and such we hold to be the case in the present instance. The ground upon which this Court will interfere, in this case, to restore to these trustees the possession of the assets, the right to the possession of which accompanies the right of property, is precisely the same assigned by Chancellor KENT, *clarum et venerabile nomen*, for the interference of the court, to prevent and remove an interruption to the possession of property in the nature of nuisance. The foundation of the jurisdiction in such a case, and the removal of such interruption by injunction, is said, by that great and good man, to be the necessity of a *preventive* remedy, where great and immediate mischief, or material injury, would arise to the comfort and useful enjoyment of property. "The interference," said he, "rests upon the principle of a clear and certain right to the enjoyment of the subject in question, and an injurious interruption of that right, which, upon just and equitable grounds, ought to be prevented." *Gardner vs. Newbury*, 3 *J. C. R.* 165. It is true, that the general principle is, that the court will not, by a preliminary injunction, change the possession of property, and transfer it to the complainant. But this is a rule to which there are, and must be, exceptions. If the possession of the defendant is a mere interruption of the prior possession of the plaintiff, that interruption will be removed by injunction, if the right is clear and certain, without driving the plaintiff to establish his title

at law. In this case, by the *agreed facts*, the whole question, in truth, turns on the validity of the deed; and, if it be valid, the plaintiff's title and right to possession are clear and certain. Moreover, the general rule only holds in cases where the right to the possession cannot be settled until a final decree, as where partners come into a court of equity for account and settlement, in which case a receiver would be appointed. If, in this case, the trustees are entitled to relief, the court cannot mock them with the shadow, and deny the substance. To deprive the defendants of possession, without giving it to the trustees, and therefore to appoint a receiver, would be to destroy the trust, and totally defeat the objects of the deed, besides exposing the transitory and peculiar property, and the State, to irreparable injury. The Court will not say that the trustees have a right to come into equity for protection, and can, in no other way, be protected, and, in the same breath, that, by so doing, they must necessarily destroy the trust. They are the officers of the court, for, by filing this bill, and submitting themselves to its jurisdiction, they stand in the same attitude as if they had originally been appointed by the Court; and the Court will so shape its remedial process as fully to protect them, and enable them to execute their trust, and to administer the assets which the assignment has placed within the jurisdiction of the Court, and, therefore, in this point of view, they are to be regarded but as receivers.

When the bill states, in this case, that the deed of assignment was regularly executed, and specifically sets out all of its provisions; that it was made upon a good and valuable consideration; that the trustees had accepted the trust; that the defendants, being a majority of the local directory, had refused to surrender up the trust estate, or permit a schedule to be made of the property and assets of the Bank; and that the trustees sought to have the trust estate protected and established, every averment was made that was necessary to give to the Chancellor clear and unquestionable jurisdiction. And these averments, when coupled with a prayer to have the trust estate protected and established, and the defendants perpetually enjoined from further intermeddling with it, entitled the complainants to have the property restored to them, and the title confirmed, if, upon inquiry, the deed

should not appear to be fraudulent. We hold the jurisdiction in the case, and the relief sought for, to be within the legitimate exercise of one of the great and primary branches of equitable relief, in regard to trust estates, which has grown up with the chancery system, and been indissolubly interwoven with it for centuries.

Before we proceed to discuss and determine the several points that arise upon the deed of assignment, it is proper to extract its general and leading features, and such other portions of it as may be thought to bear upon these questions.

The assignment was regularly executed and acknowledged, in the city of Little Rock, in the State of Arkansas, by the Real Estate Bank, in the name of the President; by virtue of her official seal, upon the one part, and by ten trustees upon the other part. It was executed in obedience to an ordinance of the Central Board; and it is admitted that the trustees, who signed the deed, composed a majority of the Central Board when the ordinance was passed, and that they are largely indebted to the corporation. The objects of the assignment were stated to be, to secure and pay the creditors of the Bank, to call in the circulation, to protect its debtors from ruin, and enable them to pay their debts. The reasons for making the assignment are, that the Bank was unable to pay the immediate demands against it, to resume specie payment upon its notes, or pay the interest upon the State Bonds, and to protect its debtors from oppression by the note-holders. The assignment is of all the property and assets of the Bank, to fifteen trustees, five of whom have not, as yet, signed the deed. The trustees are apportioned into five committees, and each committee consists of three members; one is placed at the Principal Bank, and each of its Branches. An Executive Board is formed out of each of these committees, and consists of five trustees. The duties of the committees are made to consist, principally, in taking charge of the books and papers of the respective offices; in attending to the arrangement and collection of debts due to the Bank; taking renewal of notes; determining upon the sufficiency of the security offered; and to forward the funds on hand to the Executive Board, and to report to it at its regular meetings. The Executive Board is required to make settlements, pay off all liabilities, and to do all other

acts and things which, by the deed of assignment, the trustees were authorized to do, when these duties do not come in conflict with those conferred upon the committees by the assignment; and they are authorized to delegate certain duties to the committees. The committees fill their own vacancies, if any occur; and, failing to do it, in a given time, the vacancy is to be filled by the Chancellor. The committees have authority to appoint their own officers, and so has the Executive Board. The salaries of officers are fixed by the deed. The trustees are required to give bonds to the attorney of the Bank, for the faithful execution of the trust; and the Cashier and clerks to give bonds to the trustees. The salaries of the trustees, and all the officers, are fixed by the assignment. After the expiration of two years from the assignment, all the trustees are required to meet, by an order of the Executive Board, thereupon to elect five of their own number, who shall be sole residuary trustees; and all the books, records, property, and assets of the Bank shall, from that time, vest absolutely and unconditionally in them; and the duties of the Executive Board and of the committees shall thereafter cease, and finally determine. The directory of the respective local Boards, and the members of the Central Board, are required to be kept up, according to the provisions of the charter. They are to possess no power or control over the funds and assets of the Bank, but are placed as a kind of supervisor over its affairs, to inspect and watch over the conduct of the trustees. The trustees are required to keep a full and complete account of all their acts and doings, and their books and proceedings are required to be constantly kept open for the inspection of the stockholders.

The assets of the Bank are required to be realized as fast as practicable, by the trustees; and, forthwith, after the receipt of money arising from any source, the funds are to be applied in the payment of the debts, in the following manner and order:

First—Paying all balances due the officers of the Bank.

Second—The deposites.

Third—Calling in the outstanding circulation.

Fourth—The interest upon all State Bonds, except those hypothecated to the North American Trust and Banking Company.

Fifth—Bonuses due the State.

Sixth—The principal of all the State Bonds, except those hypothecated.

Seventh—Whatever is legally due upon the Bonds hypothecated.

The fourth and sixth classes are to be paid rateably. The circulation is required to be called in and cancelled. All persons indebted to the Bank, with certain exceptions, are to be allowed to pay by instalments of one-eighth per annum; the whole to be paid by the year 1851, by discharging back interest, and interest in advance for one year, by the 1st January, 1843. The stock debts to be paid according to the charter; and all the debts to be paid in paper of the Bank. Money due upon judgment or suit, is made payable immediately, and in specie, where the debt has been attempted to be disputed; with a discretion to the trustees to extend the time. Power is given to the trustees to compound debts due to, or by, the Bank; to receive or dispose of property in payment of debts; to remove liens to save debts; to sell property for cash or credit; to compromise disputes, or submit to arbitration. A general power is given to the trustees, to turn over all the assets of the Bank to the bond-holders, they first releasing the stockholders from all liabilities, and indemnifying the State.

The first inquiry that arises upon the deed of assignment is: can a debtor, in failing circumstances, make a *bona fide* assignment of all his property to his creditors, in payment of his debts, or to trustees, for their benefit; and whether a corporate body, unless restrained by its charter, or some general law of the land, can execute a like conveyance under similar circumstances? Or, in other words, whether the law places natural and artificial persons upon the same footing in regard to such assignments?

It never was nor can be a question, either in England or the United States, but that a solvent debtor could make a valid assignment of his property to his creditors, to pay his debts. It is impossible that a question of fraud can arise in such a case; for that would be denying a man's right to pay a just debt, which certainly never yet has been, and never will be, a matter of dispute in a court of justice. The cases in which the question of fraud has come up, have been, where

Conway et al., *Ex Parte*.

a debtor was in failing or insolvent circumstances; and, in such a case, it is now perfectly well settled, in both countries, that an individual debtor has a right to prefer one creditor, or set of creditors, to another, in all cases not affected by the bankrupt system or insolvent laws. He may make the assignment for the benefit of a single creditor, in exclusion of all others; or, he may distribute his property in unequal proportions, to a part or the whole of them. No matter how, or upon what principles the distribution is made, provided the debtor assigns the whole of his property for the payment of his just debts. In such a case, neither law nor equity inquires into the reasons or motives of his preference. The right to prefer may have originally rested on the supposition that just and proper grounds of preference did in most cases exist. Be the reason of the rule what it may, the abstract right itself cannot now be questioned, either in law or equity, if the assignment be *bona fide*, and free from the imputation of fraud.

The right of a creditor to make an assignment of all his property for the payment of his just debts, necessarily results from that absolute ownership and dominion which every man claims over that which is his own. The exercise of this right is but the honest performance of a duty, which cannot be deemed a fraud. Whatever may have been the foundation of the rule, it has now become absolute, without any regard to the reason upon which it is supposed to depend. In *Grover vs. Wakeman*, 11 *Wend*. 181, it is said that "it is now too late to agitate the question, whether these assignments, either partial or general, are sustained by considerations of true policy and wisdom." They have now become thoroughly incorporated into our whole system of laws, and form a large and integral portion of the municipal regulations of the country. All that remains for the Court now to do is, to see that these assignments fairly appropriate all the debtor's property, or such portions of it as he undertakes to transfer to the payment of his just debts; and that they are not made the instruments of fraud and injustice, in placing his property beyond the reach of his creditors, or of reserving it secretly for himself and family. The assignment of a debtor's property, if made *bona fide* and free of fraud, was held by Justice STORY, in *Halsey et al. vs. Whitney et al.*, 4 *Mason*, 210, to be good; and so far, says that eminent and learned Judge, from being

prohibited, (except when they fall within the operation of the laws of bankruptcy), are expressly encouraged and upheld by the principles of the common law. And it was remarked by Lord ELLENBOROUGH, in *Pickstock vs. Lyster*, 3 *M. & S.* 371, that such assignments are to be referred to an act of moral duty, rather than of fraud. And the Court, in pronouncing judgment in the case of *Holbird vs. Anderson*, 5 *Term Rep.* 235, declare such assignments to be the most honest act that a party could do. It is merely paying one's honest debts, which is certainly a high moral as well as legal duty. And this doctrine has been asserted in a case where the very object of the conveyance was to prevent a judgment creditor from obtaining a satisfaction out of the property of his debtor by execution. The Court held, that it was not sufficient that the creditor was defeated and delayed in his remedy by such a conveyance; but the act, to be void, must be proved to be fraudulent. *Halsey vs. Whitney*, 4 *Mason*, 229. *Rex vs. Watson*, 3 *Price*, 6. *Mackie vs. Cairns*, 5 *Cowen*, 547. *Murray vs. Riggs*, 15 *J. R.* 571. 2 *J. C. R.* 565, *S. C. Vredenburg vs. White*, 1 *J. Cas.* 166. *Hatch vs. Smith*, 5 *Mass.* 42. *Hastings vs. Baldwin*, 17 *Mass.* 552. *Wilt vs. Franklin*, 1 *Binn.* 502. *Livington vs. Bell*, 3 *Watts*, 198. *Hower vs. Geesaman*, 17 *Serg. & R.* 251. *Wilden vs. Wynne*, 6 *Cowen*, 284. *Todd vs. Buckman*, 2 *Fairf.* 41. *Andrew vs. Ludlow*, 5 *Pick.* 28. *Canal Bank vs. Cox*, 6 *Greenl.* 395. *Baxter vs. Wheeler*, 9 *Pick.* 21. *Brashear vs. West*, 7 *Peters*, 608. *Wakeman vs. Grover*, 4 *Paige*, 23. *Maitland vs. Newton*, 3 *Leigh*, 714.

It is perfectly clear, both upon authority and reason, that if a debtor, in failing circumstances, can make a valid assignment of all his property to his creditors, to pay their debts, he can execute a like conveyance to trustees or third persons, to discharge the demands of his creditors. The trustees are the medium through which the payment is directed to be made. They are seized of the legal estate for the benefit of the creditors, all equity being in the *cestui que trust*, and the assignment only constitutes the means and appointment by which the debts are to be paid. If a debtor can pay his debts directly to his creditors himself, what is to prevent him from directing third persons or trustees to pay them for him? If, in one instance, it is a moral as well as a legal duty for the debtor to pay, in the other it is but the

performance of the same act, and of course must be supported by the like just consideration. The *quantum* of debt cannot alter the right to make payment, no more than can the means by which the debts are directed to be paid; and so it was expressly decided in *Anderson & Wilkins vs. Tompkins et al.,* 1 *Brock. Rep.* 446. Precisely the same point was ruled in *Marbury vs. Brooks,* 7 *Wheat. Rep.* 556, and in 11 *Wheat Rep.* 78, and in *Brashear vs. West et al.,* 7 *Peters,* 609. Indeed, such assignments are usually made to trustees, because the mode of distributing the fund is, in general, far more convenient and equitable, than for the debtor to make payment directly to the creditors themselves. It is doing the same thing indirectly, instead of directly, and in a manner more consistent with the principles of justice and equity; and this opinion the authorities conclusively prove.

This brings us to inquire into the nature and properties of public corporations, and to see whether they possess the same power of making assignments of all their effects and property, that individual debtors do, in like circumstances. A corporation, or body politic, is described by JUSTINIAN, to be " those who are permitted to form themselves into a body, under the name of a corporation, society, or other community, have within their peculiar jurisdiction, as in the similar cases of a republic, property in common, and a common chest or treasury, and an agent or head of the corporation or society, by whom, as in the republic, whatever is necessary to be done for the benefit of the community, may be transacted." *Pothier's Pand. of Justinian,* Book 3, *p.* 109, *Paris Ed.* 1833.

"A corporation (says Kyd) is not a mere capacity, but a political person, in which many capacities reside." "It is an artificial person, a succession of individuals, or an aggregate body, considered by the law as a single continuous person, limited to one particular mode of action, and having power only of the kind and degree prescribed by the law which conferred it." *Kyd on Corporations,* 13. A still more clear and striking exposition of the term is given by Chief Justice MARSHALL, in the celebrated case of *Dartmouth College vs. Woodward,* 4 *Wheat.* 518, where he says, "a corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those proper-

ties which the charter of its creation confers upon it, either expressly or as incidental to its very existence." And among its most important attributes, are its immortality and individuality; properties by which a perpetual succession of many persons may be kept up, so that they may act with the will of a single individual. This artificial personage does not share in the civil government of the country, unless that be the purpose for which it was created; nor is it punishable in its corporate capacity for personal misdemeanors or crimes. The objects for which a corporation is created, are universally such as the government wishes to promote. They are deemed beneficial, and that usually constitutes the consideration of the grant. This investiture of its personality by law, endows the corporation with certain powers and franchises, which it exercises by means of its legal or duly appointed agents.

Having its individuality conferred upon it by law, it unquestionably possesses all the attributes and properties of a natural person. It can acquire and transmit property, according to the provisions of its charter, so long as it confines itself to the objects and purposes of the grant. To deny to a corporation, whether public or private, unless it is restrained by the provisions of its charter, the power of making an honest assignment of all its assets, to pay its debts or creditors, is literally to disfranchise it of all its rights and privileges, and thereby to repeal the act of incorporation itself. Being a creature of law, so far as the investiture of the rights of its individuality goes, to that extent, and no more, it is placed on an equal footing with a natural person. The principles of ancient common law, as well as the principles of natural justice, favor and encourage the alienation of property, and especially of personal chattels. Unreasonably to attempt to fetter this power, or uselessly encumber its free and salutary exercise, is directly to invade public liberty, by assailing the rights of private property. The rights of indiviudals and of corporations are both secured and guarantied by law; and, so far as they are analogous, they possess the same immunities and qualities of acquiring and transmitting property. To endeavor to draw a line of separation between them, except that which the law prescribes, is to confound the plainest dictates of justice and of common sense, and at the same time obliterate all distinctions

between right and wrong. The assertion of such a principle, if carried into practical operation, would enable the banking corporations of the country to defeat the claims of their creditors, while it would permit them to perpetuate a gross fraud upon the community, by coercing payment from their debtors, and refusing to make payment themselves. It would, in effect, be saying, that these corporations could not be put into liquidation by any means, however much it might be desired by their agents and servants, or imperiously called for by the condition and exigency of public affairs. Such a proposition, we apprehend, will never meet the approbation or support of a court of law or equity; nor find favor or protection in a government that proves its title to its freedom by exhibiting the records of its justice. If the power that created these corporations, or that rightly represents their wills, possesses no means of winding up their affairs, by directing an assignment of all their assets in payment of their debts, then indeed we are hopelessly doomed to suffer the incalculable evils of a depreciated paper circulation. The bare suggestion of such a principle comes with its own unqualified condemnation.

The principle here stated is expressly recognized in *Catline vs. The Eagle Bank*, 6 *Conn. Rep.* 233, where the mortgage and assignment to the Savings Institution, a preferred creditor by the corporation, was held to be good and valid. And in the *Union Bank of Tennessee vs. Ellicott et al.* 6 *Gill & John.* 375, the court say, "It is our opinion, that the assignment was a good, valid, and effectual deed, and that the president and directors of the bank were authorized to transfer all the property of the corporation for the payment of the debts." *Savings Bank vs. Baten*, 8 *Conn.* 512.

The assignment of the Maryland Bank to Trustees, is very similar to the case now before the Court. The assignment was made by order of the directory, to trustees, to pay its debts; and the reasons assigned are the same. The corporation in that, as in this case, made the assignment under their official seal. In the case of the *The State vs. the Bank of Maryland*, 4 *Gill & John.* 219, it was expressly decided, that "a corporation, as well as an individual, is bound to provide for the discharge of its debts;" and whether the payment is made with money from its vaults, or by the sale or assignment of its effects,

45

for that purpose, can make no difference. The principle is precisely the same. As its property may be seized and sold, as in the case of an individual, under execution, for the payment of its debts, what reason, then, can be given, why the corporation itself, instead of waiting for judgment and execution, cannot sell and convey its own property for the payment of its debts? No satisfactory reason has been advanced, and "none (says the court,) can be perceived." A corporation, then, in failing circumstances, unless restrained by some provision in its charter, (which is not pretended to be the case here), may assign its property to preferred creditors, or to trustees, for their benefit, as well as individuals in like circumstances. And this is true, whether the assignment be partial or general, if it transfer the whole fund in good faith, and without fraud. The power to make the assignment grows out of the relation of debtor and creditor; and a bank, like an individual, may assume to itself, by its charter, this relation. The law holds it to be its duty; and when a debtor distributes all his property among his creditors fairly, for the payment of his debts, no one can reasonably complain of the act, or question his power or its propriety.

The assignment now under consideration is taken out of the operation of the general bankrupt law, by an express provision; and this State has no insolvent laws affecting the rights and franchises of corporations.

Whether the assignment amounts to a forfeiture, or not, of the charter of the Bank, is a point upon which we express no opinion, as that question is not now properly before us, upon the present application for an injunction. Besides, no objection has been taken to the deed upon the ground that it is a forfeiture of the charter. But should the stockholders or directory ever again attempt to exercise the privileges of banking, the State is fully authorized to sue out a *scire facias* at any time, and test the question of forfeiture.

Having shown that the Real Estate Bank of the State of Arkansas can make a *bona fide* assignment of any part, or all her assets, to pay her debts, it now remains to be seen what power represents the will of the corporation. Is it the stockholders, the local directory, or the

Central Board? It cannot be the stockholders, for they have no right or authority to bind the corporation, either in their individual or collective capacity. They no more represent the corporation, in a legal point of view, than do the people the legislative powers of the government. Their rights and franchises are fixed by the charter, and so far they can go, and no farther. It is equally clear that the several local boards do not represent or embody the will of the corporation; for, if they did, then there would have to be as many corporations as there were wills in these directories; and, consequently, there would be more banks than two, which is expressly forbidden by the constitution. This question is no longer left open for investigation or decision. The point was fully and conclusively adjudged by this Court, in the case of *The State vs. Ashley and others*, 1 *Ark.* 548, 549, 550, 551, 552. The respective powers of the central and local boards were then analyzed and compared with each other, and their several jurisdictions and authorities specifically defined. The Court held, in the opinion then delivered, that the duties enjoined and powers conferred upon the Central Board, by the charter, were of the most general and important character, and that it was difficult to conceive how the Legislature could have conferred a more widely extended authority. Complete and unlimited control is given to the Central Board over the acts and proceedings of the respective local agencies or offices, in order that the credit and welfare of the Bank might be kept up and preserved. The general interests of the Bank are committed to its custody and care, by express grant; and so is the power to settle and control the general accounts of the institution. It is invested with complete and plenary power for the well-governing and ordering the affairs of the Bank; and, finally, it is said,' " that the Central Board represents the unity, sovereignty, and indivisibility of the corporation, by means of its legislative powers." The corporate existence of the Bank, which is composed of separate and component parts, is held together by this bond of union; and it is the *Central Board alone* that makes it, in the language of the constitution, *one banking institution,* and *one indivisible corporation.* It is a perfectly clear position, then, that the Central Board alone is the organ by which the Real Estate Bank of the State of Arkansas speaks and

Conway et al., *Ex Parte.*

acts; and its voice and mandate must be respected and obeyed, while the government of its affairs continues to move within the appropriate orbit of its charter.

If this be true, it is manifest that the legal title and possession of all the property of the Bank, and all its assets and effects, appertain, as matter of right, as well as of duty, to the corporation. The argument, then, that the Central Board could not order the Bank, by her corporate seal, to pass the legal right and possession, by a *bona fide* assignment to trustees, for the benefit of her creditors, utterly fails. It is true, that a trust estate can only be created or carved out by a party who is entitled to the fee, or who possesses the legal interest. The Bank has the legal estate; and being entitled by law to its government and direction, she unquestionably possesses the power of appointing trustees to manage the estate. A corporation can only act by agencies; it can do nothing by itself. Being, in contemplation of law, a person, invisible and intangible, its authority and power can only be felt and seen by the acts of its agents, who are its officers and servants. In the present case, this agency has acted by the President of the Bank, in the name of the corporation, and under the authority of its official seal, by making the assignment of all the property of the Bank, and its assets and effects, in trust for the benefit of its creditors.

It is a universal rule, in the construction of all deeds, that fraud is never to be presumed. The reason of the rule rests upon such plain principles of justice and propriety, that it needs not the force of argument, or weight of authority, to support it. The party that charges fraud is bound to prove it, and that, too, by legal and competent evidence. This evidence may be found in the deed itself, or it may be established by other affirmative proof. But still, in both cases, fraud, either actual or constructive, must be brought to light with reasonable certainty, and shown to be fairly applicable to the agreement sought to be impeached. Mere conjecture or surmise, however probable or persuasive, is never allowed to establish fraud. To impute legal or moral guilt upon such grounds, would be to overthow the whole doctrine of the law of evidence, and produce the utmost uncertainty and injustice in the construction of all contracts or agreements.

Keeping in view this plain and familiar principle, we will now proceed to analyze the deed, and to compare its provisions with the rules of law and the principles of equity. It is proper here to remark, that, as the trustees have come into a court of equity, and have asked its aid to assist them in the trust, by requiring the assets of the Bank to be delivered into their hands, the deed must show, upon its face, that it has all the formalities and solemnities that the law requires, and that it contains no unjust or inequitable provision. In either of these events, it will be held to be invalid, and, of course, the trust under it cannot be protected or enforced. The maxim is, if you ask for equity, you must do equity.

Has the deed the proper parties? Are there a legal grantor and grantee? The deed was duly executed and acknowledged, in obedience to an ordinance of the Central Board, by the President of the Bank, under the official seal of the corporation, and ten trustees, by their private seals, who composed a majority of the Central Board that passed the ordinance. This being the case, it is said, that neither the Bank nor the stockholders were represented in the contract, or that there was not the junction or assent of the two distinct and separate wills, which is necessary to make a binding agreement. Is this position true? The definition and nature of a corporation show it to be an artificial being, invisible and intangible, speaking only through its constituted organ, under its official seal. This legal personage, invested with the individuality of a corporate being, is wholly distinct, and widely separated from the agents and officers of the Bank, through whom the action of the corporation is felt and seen. The corporation of the Real Estate Bank of the State of Arkansas *is one thing*, and the directors and stockholders an *entirely distinct and different thing*. The Central Board represents the legislative functions of this corporation, and its will, when it has the sanction of official authority stamped upon it, speaks in the name and in behalf of the corporation. In the present case, it is the corporation, acting under her official seal, that is the grantor, and the trustees are the grantees. In their character as trustees, they are seized of the legal interest, for the benefit of the State, the creditors, and the stockholders, holding the fund to be distributed agreeably to the provisions of the deed. They are, cer-

tainly, not the corporation, either in point of fact or law. That the trustees constituted a majority of the Central Board that passed the ordinance, does not prove that this ordinance divested the corporation of the power to contract, or in any manner invaded its rights or franchises. By becoming trustees, they may, and probably do, cease to be directors. A corporation is compelled to act by agencies, but, when the act is completely executed, it is then the act of the *corporation itself*, and, as such, is entitled to full faith and credit. There were, in the present case, then, two distinct and separate wills, founded upon a valuable consideration, entering into, and forming, the deed of assignment; the corporation of the Real Estate Bank of the State of Arkansas, *upon one side*, who was *the grantor*, and the trustees upon the *other side*, who were the *grantees*. The deed of assignment is, then, the contract of these two parties. The corporation is, in law, a single person, totally distinct from the directory or corporators that compose it; and these latter individuals have no greater interest in the corporation, or control over its affairs, than the qualified ones of electing its officers, receiving the dividends and profits, and doing whatever other things accrue to them as rights, by the act of incorporation. *Warner vs. Beers*, 23 *Wend*. 103, 173. *Pratt vs. Bacon*, 10 *Pick*. 126.

The assignment, in this instance, seems to us not to be wholly without warrant or precedent. Similar conveyances, embracing the like principle, were executed by the Bank of Maryland, and the Berkshire Bank of Massachusetts. The directory, in the first case, appointed Thomas Ellicott sole trustee, and he afterwards joined with the Bank *in conveying to himself*, and two other trustees. In the second case, the directory, consisting of four persons, of whom the President was one, appointed the President an *attorney in fact*, with power to assign a negotiable note, in payment of a note of the Berkshire Bank. In both cases, the deeds were held good, and the Supreme Court of Massachusetts, (11 *Mass. R*. 292), in delivering the judgment in *The Northampton Bank vs. Pepoon*, say " there is no reason why the power should not be exercised by one of the body which authorized its execution, with the consent of the rest, who sanctioned it by their votes." Now, if the directory could appoint one of their body an attorney in

fact, to make the assignment, no reason can be shown why they could not have empowered any number of that body to perform the same act. And we have already seen, that the quantum of interest assigned can make no difference in principle. If one note could be thus assigned, to pay a specific debt, all the assets, surely, might be conveyed, in payment of all the liabilities of the corporation. But it is contended, that the Central Board, being trustees themselves, could not delegate their powers. The answer to this objection has been already given: They are not trustees in the technical meaning of the term. While in the discharge of their appropriate duties as a Central Board, they were not amenable for their conduct to a court of chancery. In ordering the assignment, they acted in the capacity of representatives, declaring the sovereign will of the corporation. Their ordinance, then, was not, legally speaking, a delegation of power, but it was simply the appointment of trustees to pay the debts of the corporation. This they had a right to do. The deed, then, in this respect, possesses all the requisite formalities of law, and, of course, must be held to be good, unless it be shown to violate some other legal or equitable principle applicable to such conveyances.

Another objection taken to the face of the deed is, that all the trustees did not sign it, and, therefore, it is void. Ten out of fifteen signed: the other five have not, as yet, put their names to it. Is such a signing good? We certainly hold it to be so. It was not necessary for any of the trustees to have signed, to make the deed valid. All that equity requires, is their assent and acceptance of the trust. If they have done any one act by which their assent may be implied— for instance, if they have agreed to take upon themselves the execution of the trust, equity holds them bound for its performance, and will not release them from their voluntary obligation.

There is no necessity for the execution by the trustees. Any act done in relation to the property, showing that they claimed it, as trustees, or that they desired to reduce it into possession, undeniably proves their assent.

The moment the deed was made, the right of property passed and vested in the assignees; and the relation of trustee and *cestui que trust*, as between them and the creditors, was at once established, so that

the assignor could not recall the deed. *Cunningham vs. Freeborn*, 1 *Edw.* 262. *Ellison vs. Ellison*, 6 *Ves.* 656. *Brun vs. Winthrop*, 1 *J. R.* 329. *Brooks vs. Marbury*, 11 *Wheat.* 78. *Nicholson vs. Wardsworth*, 2 *Swans.* 370. *Adams vs. Taunton*, 5 *Mad.* 438. *Bonefant vs. Greenfield*, 1 *Leon.* 60. *In the matter of Stephenson*, 3 *Paige*, 420. *King vs. Donnelly*, 5 *Paige*, 46. *In the matter of Schoonhover*, 5 *Paige*, 559.

That assignees had not executed the deed, or entered into covenants to perform the trust, is no objection. If the assignee has accepted the trust, and is ready to take possession, and enters upon the performance of the trust, he is as much bound as if he had covenanted; and this principle the case of *Cunningham vs. Freeborn* proves. Moreover, where assignees do not assent, at the time, but afterwards, their assent relates to the time of executing the deed. In no point of view, then, does the validity of the deed depend upon the execution by the trustees, unless there should be some express covenant, making it indispensably necessary that they should sign; which is certainly not the case here. *Wilt vs. Franklin*, 1 *Binn.* 518. These authorities seem to us unquestionably to prove, that there was no necessity for any one, much less for all, of the trustees to sign the deed, to make it valid. *Nicholson vs. Wardsworth*, 2 *Swans.* 370. *Adams vs. Taunton*, 5 *Mad.* 439. *Bonefant vs. Greenfield*, 1 *Leon.* 60. The law is, that even creditors are presumed to give their assent to the deed, as it is made for their benefit, unless they come in and specially object to it. Deeds of trust are often made for the benefit of persons who are absent, and even for persons not in being; whether they are for the payment of money, or for any other purpose, no expression of the assent of such person is necessary. And such trust is always held to be executed, upon the principle that the deed is complete when the trustees take upon themselves its performance. It is not even necessary to the validity of such assignments, that the creditors should be consulted. Creditors are always presumed to be willing to receive their debts from any hand that will pay them. And these principles have been fully recognized and conclusively settled by the Supreme Court of the United States, in *Brooks vs. Marbury*, 11 *Wheat.* 78, and in *Brashear et al. vs. West*, 7 *Peters*, 608.

Conway et al., *Ex Parte*

But even suppose that the ten trustees, who signed the deed, were incompetent to take, still, the other five being competent, a court of equity would not permit the trust to fail; for it is a rule in equity which admits of no exception, that a court of equity never wants a trustee. Whenever a trust is created, either by deed or will, or by operation of law, and no person is appointed trustee, equity will follow the estate, and cause the trust to be executed. If no trustee is named, or he dies, or the trust devolves upon an incompetent person, the trust shall prevail, and the Chancellor will appoint trustees. *White vs. White,* *Bro. C. C.* 12. *Att'y Gen'l vs. Rupin,* 2 *Peere Wms.* 425. *Ellison vs. Ellison,* 6 *Ves.* 663. 2 *Story's Equity,* 241. *Co. Lit.* 113, *a, n.* 1. *McCarty vs. Orphan Asylum Society,* 6 *Cowen,* 337.

It is contended that, as the entire legal estate vested by operation of the deed in the whole number of the trustees, of course it cannot, afterwards, be divested out of them, and the legal estate pass into a less number. This argument takes for granted the point in controversy to be proved. The vesting of the estate is by operation of the deed. If the deed be valid, it must all stand together, provided its parts can be made to harmonize. The trustees take under the deed, and by its authority. When that authority is limited to a particular period of time, and made then to terminate, of course the estate vests according to the condition of the grant. That condition is, that, at the expiration of two years from the execution of the deed, the whole trust estate shall vest, solely and absolutely, in five residuary trustees. It is certainly true, that the estate must vest according to the provisions of the deed, and the trustees hold under it agreeably to its legal tenor and effect. Now, to say that the deed is valid, and the condition void, would be to give to the instrument such a construction as would practically defeat its true object and design. This provision of the deed is nothing more nor less than an agreement among the trustees, to elect five out of their number, after the expiration of two years, in whom the whole trust estate shall, thereupon, absolutely vest. It is the same thing as if the deed had contained a clause, that, if ten of the trustees had resigned their office, their places should not be filled, but that the other five should administer the whole fund. Now, we hazard nothing in saying, that such a clause, inserted in a deed,

46

Conway et al., *Ex Parte.*

would not vacate it. Until the contingency happens, upon which the estate vested, the whole trustees are seized with the legal fee, subject to the condition of the deed. Whenever the condition takes effect, their right to continue trustees depends upon their election to fill the office. In the case of the Bank of Maryland, after the assignment was first made, the trustees were increased from one to three, by the second deed, subsequent to the first conveyance. Why, then, may they not be diminished from fifteen to five by the first original deed, containing such a condition? If there can be any sensible distinction drawn between the two cases, we confess we cannot perceive it. To give to a party a right to make an assignment, according to the exercise of his own free will, and, at the same time, to deny him the choice of his own form of the deed, would, in effect, be to destroy the privilege granted to him.

We will now look into the provisions of the deed, and determine the true nature and character of the assignment.

The Bank has assigned all her real, personal, and mixed estate, together with all her assets and effects, to the trustees, to pay her debts and creditors. There is no secret reservation in favor of herself, nor is there any resulting trust created for the benefit of the State or stockholders. All the property is assigned, to pay all her debts; and she has made it the duty of the trustees to proceed, as speedily as possible, to realize all her means, and *apply them, forthwith,* to the payment of her debts, in the manner and order designated. Is that order just and equitable? We have already shown that the power to make an assignment of all a debtor's effects, gives him the privilege of preferring one creditor, or set of creditors, to another, provided, that, in the exercise of the right, he commits no fraud. There has been no exception taken to the manner of payment of any of the classes of the debts mentioned in the deed, except as to the payment of the seventh and last class, which is said to be unjust and inequitable. The deed discloses, on its face, enough of the history of the five hundred bonds of one thousand dollars, which are in the hands of Holford & Co., of London, to have made it necessary to insert a particular clause in the assignment to meet that case; and it states the true reason why these bonds were postponed to the seventh and last

class. The Bank had hypothecated the bonds to the North American Trust & Banking Company, for a given amount, and by them they were sold or pledged to Holford & Co. for a much larger amount. Holford & Co. claim to be innocent purchasers of the bonds, for a valuable consideration, without notice; and, therefore, they insist that they are entitled to full payment upon the bonds. In behalf of the Real Estate Bank, it is said, that the North American Trust & Banking Co. improperly sold and delivered them to Holford & Co., in violation of their agreement with the Bank, of which Holford & Co. had notice. Now, the deed provides, that the trustees shall pay whatever amount, with interest and exchange, was actually received by the Bank, upon the hypothecation of the bonds, in the event that they can be cancelled or delivered up. This provision is just and equitable. But had the deed stopped there, and contained no other clause in reference to the matter, it might, and probably would, have committed a fraud upon the rights of Holford & Co. provided they were innocent purchasers without notice. But it goes on expressly to declare, that " whatever legal amount shall be found to be due upon the bonds, shall be paid." What that amount is, the Bank does not pretend to fix, but leaves the matter open for an amicable arrangement, or for legal inquiry and decision. The object of the deed, so far from intending to defraud Holford & Co. of payment, or unnecessarily to delay or hinder them in the collection of their debt, expressly covenants, that whatever is due them, either legally or equitably, shall be paid, whenever ascertained. It leaves the courts of justice open to these creditors, and it invites them, by compromise or suit, to ascertain what amount is legally or equitably due. And that amount, be it greater or less than the sum received by the Bank upon the hypothecation, it pledges all the assets of the Bank to pay, and commits its funds to the hands of the trustees for that purpose. It is true, it postpones the payment to the last class, but that neither invalidates the claim, nor questions its equity. In *Holbird vs. Anderson*, 3 *T. R.* 235, and in *Pickstöck vs. Lyster*, 3 *M. & S.* 371, it is laid down, that a sale, assignment, or other conveyance, is not necessarily fraudulent, because it may operate to the prejudice of a particular creditor. The Bank is liable for the payment of these as well as the other bonds.

Should her assets, however, unfortunately prove insufficient, then the State is responsible for whatever amount is justly and equitably owing by her; and the holders of these bonds, as well as those of our other public securities, need be under no apprehension, but that she will faithfully and honorably discharge, to the utmost farthing, all her engagements, regardless alike whether they be in the hands of foreign or domestic capitalists. The principles of private virtue, as well as of public justice, (which we are confident our citizens and our government will ever respect and obey), utterly forbid the idea that this young, free, and prosperous State, will ever permit one jot or tittle of her plighted faith, or recorded honor, to fall to the ground.

It is admitted, by agreement upon the record, that ten of the trustees are largely indebted to the Bank; and that being the case, it is asserted, with much earnestness and confidence, that a corporation cannot make its debtors trustees for the payment of its debts; for that would release their own liabilities, and thereby perpetrate a fraud on the rights of creditors. If a creditor appoint a debtor his executor, it is unquestionably true, that such nomination shall operate as a release and extinguishment of the debt, on this plain principle, that a debt is merely a right to recover the amount due by way of action. And as the executor cannot maintain a suit against himself, his appointment by the creditor to that office discharges the right of action, and, with it, the legal remedy for the debt. It is, in fact, a release at law of the debt, by an extinguishment of the right to recover it. The legal remedy is for ever destroyed, by the act of the party himself; but this is not the case, where that remedy is suspended by the act of law, as the administration of the effects of a creditor. This is only a temporary deprivation of the remedy, by the legal operation of the grant. In equity, the rule is different. It will never permit the testator, by constituting his debtor his executor, to disappoint or annul the claims of his creditors. If there is not a sufficiency of assets to pay the debts, the debt of the executor becomes assets for that purpose, and the duty remains unchanged to contribute, although the action at law is gone. It would be highly unreasonable, as well as unjust, to permit the claims of friendship or affection to defeat the rights of justice or of honesty. In respect to legatees, equity will,

generally speaking, allow the appointment of a debtor executor to operate as a discharge of his debt. This rule, however, is subject to a great variety of circumstances. Equity will not release the debt against the legatees, if there be a reasonable presumption that the testator did not intend to extinguish the debt; for the debt is considered in the light of a specific bequest or legacy to the debtor, and for the express purpose of discharging his liability. If the testator leaves the executor a legacy, it is a sufficient indication that he did not mean to release the debt; and, in such a case, the executor will be considered as a trustee for the amount of his debt, to the residuary legatee or next of kin. *Carey vs. Goodrich*, 3 *Bro. C. C.*, 310. *Toller on Executors*, 350. Where a debtor was appointed executor, even without a legacy, and it appearing by the will that the testator considered him in the light of a *mere trustee* of his whole property, it was held that his debt was clearly not extinguished. Now, if this be true, it unquestionably follows, from the authorities above cited, and the reasons adduced in support of them, that whenever a party is constituted trustee, that very fact shows, conclusively, that it was not the intention of the grantor to discharge his debtor's liability. The moment that he becomes trustee, there is no principle in his favor to release the debt, unless the deed or will clearly and expressly discharges him from all liability. His acts being in a fiduciary capacity, his debt becomes equitable assets in his hands, which he can be made at any time to account for, and pay over in a court of equity. We can perceive no reason why his co-trustees, in a court of equity, could not bring a suit against him. His failure to pay would be a breach of trust; and equity would enforce its performance, or the entire estate might fail. Besides this responsibility, we have no doubt that his failure to pay his own debt would furnish a court of chancery good cause for his removal from office. Whether the assignment to a debtor is an extinguishment of his debt, must ever be a pure question of intention. And when property vests in trust, such intention is absolutely and expressly negatived and disproved; and there can be no longer any shadow of pretext that the debt was intended to be extinguished. The relation of trustee and *cestui que trust* carries with it conclusive evidence, that the debt of the trustee was intended to

be paid. If a testator should devise all his property to his executor, in trust for the benefit of his wife and children, and the whole or a large portion of his estate consisted of the liabilities of his executor, could any one assert that the debt of the executor was released? The same principle must follow if the trust be created by deed; and the case put is no stronger than the one now before the Court.

The assignment to the debtors of the Bank, neither delays, defeats, nor in any manner embarrasses the rights of creditors. Their remedy against these debtors is as full, as speedy, and as ample, as against any other class of persons. All the legal interest vests by the assignment *nominally* in the trustees, but *substantially* in the *cestuis que trust*, or creditors, (they being entitled to all the profits or equity); and the residuum, if any, after the payment of the debts, results to the stockholders or grantor. The trustees have not even a beneficiary interest in the estate; they are seized for *others*, and not for themselves. The moment they are seized, that moment all the substantial benefits of the fee pass out of them into others. They are merely the legal recipients or organs, by which the conveyance is rendered valid for higher and more beneficial purposes. In no possible event or contingency can they take or retain any interest in their own hands for themselves, without being called to account, and pay over to those who are equitably entitled to take it. All the parties to the deed have a right to come into a court of equity, to have the trust specifically executed. Upon its execution, all the assets are first appropriated to the payment of the creditors, and the residuum returns to those who created the trust, or who are entitled to its resulting benefits. These principles are primary and universal, and seem to us to demand the assent of every rational mind. If they be true, then it necessarily follows, that the assignment of the Bank to her debtors neither releases their debts, nor creates the slightest presumption of fraud against the deed or trustees.

The objection taken to the deed, that it extends too great indulgence to the debtors of the Bank, by allowing them to pay in eight annual instalments, until the whole amount of their liabilities is discharged, is, certainly, at first blush, plausible and imposing; but, in our judgment, it is neither sound nor tenable. It is unquestionably

true, that any assignment which unnecessarily delays, or unjustly hinders creditors in the collection of their debts, would, of course, be fraudulent, and therefore void. The difficulty is to determine what length of time would raise this presumption. It must always remain a question of fact, to be judged of according to the nature of the transaction, and the condition of things that existed at the time of the execution of the deed. It has been correctly remarked, in *Grover vs. Wakeman*, that " every conveyance of property to trustees, is, to a certain extent, a hindering and delaying of creditors. It interrupts and presents obstacles to their legal remedies; and every such assignment is absolutely void, if it does not appoint and declare the uses for which the property is to be held, and to which it is to be applied. A provision, that the uses shall be₍subsequently declared by the assignor, will not do; they must accompany the instrument, and appear upon its face, in order to rebut presumption of a fraudulent intent. But where the assignor parts with all control over the property, for the benefit of his creditors, without any reservation or stipulation for his own benefit, the honesty of his intention is so clear, and the advantages to the creditors so apparent and decisive, that they cannot be said to be obstructed or delayed in their remedies."

The Real Estate Bank is a public corporation, and we are bound judicially to know the condition of her liabilities and assets; for these are to be found in the general history of the country, and in the reports of the legislature, and her own sworn officers. The laws of commerce, and the usages of trade, and the character of the exchanges, as the circulating medium of the country, are always received as judicial evidence; and all contracts in reference to them, must be construed and determined according to the existing state of things under which such agreements were executed. The importance and necessity of this general rule cannot be overlooked or disregarded, without committing great violence upon the language used in such instruments, and grossly perverting the true object and real intention of the parties to the contract. This principle has been repeatedly recognized and affirmed by the highest authority. 1 *Stark. Ev.* 455. *Plow.* 12. *Kirk vs. Norvell*, 1 *T. R.* 118. *Erskine vs. Murray, Lord Raym.* 1542. Upon the like principle, this Court held,

in the case of *Dillard vs. Evans,* that the term " common currency," meant Arkansas Bank notes, as they, at the time of the contract, constituted the common circulating medium of the country, which we were bound judicially to know.   It was determined, in *Warner vs. Bears,* 23 *Wend.* 235, that acknowledged, uncontradicted facts of the times, of any law or constitution, have always been judicially appealed to, for aiding the Court in the decision of doubtful, constitutional, and legal interpretation.   Now, if this be true in regard to the constitution and laws of a country, surely the principle cannot be false when applied to the construction of a deed of assignment.   And the Court aptly remarked, in the case that has been cited, that the history of those times, and the journal of the Convention, were not set down to be passed on by a jury, but were to be used as the proper materials of judicial reasoning.

The liabilities of the Bank, according to her own showing, and what is admitted to be true by the respective counsel engaged in this cause, amount to a fraction over two millions two hundred and fifty thousand dollars, while her assets are set down at about the same sum, possibly a fraction more.   In this calculation are included all the debts that are owing to her; and in realizing these assets, it is but reasonable to suppose that she must sustain a considerable loss in their collection.   Her circulation is near half a million.   The debtors to the Bank received loans, under the tacit and implied agreement that they should be paid up in such proportions or instalments as might be required.   Neither the Bank nor the debtors ever contemplated that the whole amount should be paid up suddenly, or by oppressive calls; nor did the creditors look to this kind of payment for their indemnity.   The condition of things, when these debts were created, and the present state of affairs, are widely and essentially different in every respect.   Great pecuniary embarrassment and distress are now acknowledged and felt by all classes of society.   The pursuits of labor yield but a meagre and scanty reward; and property of all kinds and every description is universally admitted to be greatly depressed in price, and, in most cases, far below its real and intrinsic value. This state of things has been produced by a great number and variety of causes, among which, the facility afforded by banks, and

their depreciated currency, have contributed in no small or measured degree. Now, would it would be just or equitable for the Bank, in this season of universal distrust and embarrassment, to coerce immediate or hasty payment of two millions of dollars from the debtors? Such a course, we apprehend, would neither be consistent with justice or equity; and it would be wholly impracticable to enforce immediate and hasty payments from an agricultural and embarrassed people, and would end in disappointment and ultimate loss. The creditor, instead of being benefited by such a course, would be injured; for the assets of the Bank would be materially lessened, and a considerable portion of its means utterly destroyed. In the present state of things, the Bank can only secure her creditors by allowing her debtors reasonable indulgence. Her debtors can only make payment by the means arising from labor, or the sale of property. Time must be given to labor, to make its profits available. In the nature of things, the means arising from labor must be somewhat slow and progressive; and hence the reasonableness of the indulgence given to the debtors of the Bank. Again: if the property of her debtors was speedily or hastily brought into market, the Bank would inevitably lose a large amount of her assets, and thus her creditors would be seriously injured. Besides this loss, the oppression upon her creditors would be insupportable. The constitution contemplated that the Bank, when established, would aid the agricultural interest of the country; and in no event ought its affairs to be so managed as to ruin it. Under all these circumstances, the inquiry is, are eight years an unreasonable extension of payment, or was it improper to allow the debtors to pay in annual instalments? We deem the time but reasonable and just, and the mode of payment judicious and equitable. A less time would have injuriously affected the vested, legal, and equitable rights of all parties; and any other mode of payment would have greatly prejudiced their interest. Of the amount of debt owing by the Bank, the principal of her bonds is not due until the year 1862. This debt she is certainly not delaying, but has provided means of payment to meet it, about eighteen years before it becomes due. The interest of her bonds is nearly one hundred thousand dollars, accruing semi-annually. Now, if she is reasonably successful in

realizing her means, and provident in their application, there certainly cannot be any serious delay in paying this debt, and taking up her circulation. If there be any pretence for saying that there is fraud in this matter, on whom, then, is it made to operate? Certainly not upon the bond-holders, nor upon the holders of the notes, nor upon those who are entitled to receive the semi-annual interest. Will it, then, fall upon the State or the stockholders? The privilege and indulgence given to her debtors, are the only probable means by which the State can be indemnified, or the interest of the stockholders protected. If we are right in this position, then no inference or badge of fraud is shown, or can be presumed, from the indulgence or time given to the Bank's debtors to make payment.

It is objected to the deed, that the trustees are not at liberty to pay off the interest and principal of the bonds before they fall due. This objection is unfounded. The assignment requires them to make collections as speedily as may be safe or convenient, and forthwith to proceed to pay off the liabilities of the Bank, in the manner and order designated in the deed. It is said that the bond-holders will refuse to part with their securities before they become due; and that being the case, that, as the trustees have no power to make any disposition of the fund, the whole outstanding capital will remain unpaid at the expiration of eight years, and therefore, in this respect, the deed commits a fraud upon the stockholders. It is barely possible, that a creditor may refuse payment before his debt becomes due; but we certainly think that such a presumption is violent in the extreme, in the present condition of things. In the language of Chief Justice Marshall, "it is but reasonable to presume, that a creditor will be always willing to receive payment from any hand that tenders it." And the present, and we fear the future, depreciation of American stocks, in our own as well as in foreign markets, gives to this presumption the dignity of full and uncontradicted proof. The deed of assignment created a trust; and the moment the estate vested, it was placed under the peculiar jurisdiction of a court of equity. The trustees are bound to make the funds available, and apply them properly. No profits can arise to the trustees, in any case whatever. Equity holds them to do every act that reasonable or discreet agents

can do, to make the assets of the Bank answer its ends; and it will charge them for the slightest dereliction of duty. It will charge each trustee for the funds coming to his hands, and will hold him personally responsible for every devastavit he commits, not only to the extent of his bond, but for the full amount of the waste committed, and that, too, under the penalty of removal. The trustees can make no contract whatever, that will accrue to their benefit; but whatever advantage might arise therefrom, necessarily results to the benefit of those for whom they hold the estate. They are bound, not only for wilful neglect, but for all misfeasance and nonfeasance in office; and that would be the case, if there was no clause in the deed fixing upon them any such responsibility.

We are at a loss to conceive how the stockholders, State, or creditors, can be injured, if the trustees can pay all the debts by the assignment of all her assets. Judging from the present condition of the Bank, such an assignment, so far from injuring any of the parties to the contract, would essentially benefit them all. For its liabilities, it will be remembered, are nearly, if not quite, equal to its assets, without taking into account the loss that must accrue from bad and doubtful debts.

It is asserted that the Bank cannot make an assignment, unless she is in failing or insolvent circumstances; and that, as the deed does not show such a state of things, therefore it is fraudulent as to the stockholders. We hold this proposition to be wholly untrue, both upon reason and authority. The power of a bona fide assignment is given to a solvent as well as an insolvent corporation; and, like assignments by individual debtors, there never can, by any possibility, arise a question of fraud as to the first case. We deem it, however, unnecessary to discuss this point; for surely it cannot be difficult to show, that a Bank, which has suspended specie payment for years, and that has not the means of resuming, and whose circulation is depreciated more than one-half at her doors, is surely in failing circumstances. And we think we cannot be accused of great presumption, should we even add, that she was in so critical a condition, that her affairs required an immediate assignment, of some kind or other. Many of these facts appear upon the face of the deed, and the rest are matter of public history.

The argument, then, fails, for there is no basis upon which it can be made to rest.

The objections taken to the illegality and insufficiency of the trustees' bonds; the compensation to the officers; the want of a proper schedule of the assets; the onerous stipulations in regard to debtors that have been sued, and against whom judgments have been obtained; —all go, except the first and fourth, to question the policy and propriety of the assignment, and can, in no contingency whatever, affect the validity of the deed, or raise a presumption of fraud against it. The first objection, as to the legality of the bonds, is certainly entitled to but little notice. A bond, given to the attorney and his successors in office, is as legal as one given to the Executive and his successors in office. And in both cases, the law makes the party to whom the bond is given, hold it only for the benefit of those for whom it was executed; but in the event of his vacating the office, it passes, with all its attaching rights, into the hands of his successors, for like just and equitable purposes.

The imperfectness of the schedule creates no objection against the deed, for the assignment contains the evidence by which it can be completed hereafter; and the assets are described with sufficient certainty, as the cases of *Stover vs. Bell*, 3 *Wash. C. C. R.* 389, and *Halsey vs. Whitney*, 4 *Mason*, 219, clearly establish.

In regard to the insufficiency of the bonds of the trustees, and other officers, to secure the parties interested from loss or injury, that is a discretionary question for the Central Board, which this Court cannot inquire into, unless it was so flagrantly unjust and inequitable as to raise a presumption of fraud, which is certainly not the case here.

A supervising control of the central and local boards is placed, by the assignment, around the acts of the trustees; and the books and accounts of the Bank are required to be kept open for the inspection of all the stockholders; and every other person legally or equitably interested in the deed could require their production. And when, to these guards, are added the protection and scrutiny of a court of chancery, it appears to us that the corporation, acting by the Central Board, has taken, for the benefit of the State, the stockholders, and

Conway et al., *Ex Parte.*

creditors, a fair and reasonable share of personal responsibility. It is certainly true, that this trust, like all others confided to human hands, is liable to abuse; but that is no argument against its validity. Man is compelled to trust much to his fellow-man; and, after all, the higher and nobler properties of nature constitute the best security, and most effectual guaranties, that can be either given or taken in defence of life, liberty, or property.

Having now gone through the investigation of this cause, we will briefly state, by way of distinct propositions, the leading points and principles we have discussed and decided:

That this Court possesses the power to issue a peremptory mandamus cannot be denied, for the constitution gives it, by express grant.

That the Judge of the Circuit Court had jurisdiction, and should have granted an injunction, we cannot doubt. The peculiarity of the property, and the nature of the assets, forbid the idea, that due compensation could be given, in damages, for their improper use and destruction. The property being a trust estate, is placed peculiarly, if not exclusively, under the jurisdiction of a court of equity. To turn away the trustees, under such circumstances, would, in our opinion, be for ever to close the doors of chancery against the most numerous, helpless, and meritorious class of her suitors.

To question the power of an individual debtor, or banking corporation, in failing circumstances, to make an honest assignment of all their property to pay their debts, would be to assail one of the principal safeguards of public liberty, by fettering the free enjoyment of private property.

To say that the Central Board does not represent the will of the corporation, is to assert, that there can be more banks than two, which the constitution expressly forbids.

To contend that the deed wants proper parties, is to make two things, which are wholly separate and distinct, one and the same. It is, in fact, to make an artificial being a natural person, which is a legal as well as physical impossibility.

To argue that the trustees cannot be reduced in number, according

to the provisions of the deed, is to deny its validity by defeating its operation.

To question the order and manner of the assignment, is to impeach the right of preference, which constitutes the only legitimate and distinguishing privilege of such conveyances. The deed, by declaring that whatever amount is found to be due Holford & Co., of London, either in law or equity, can be paid, certainly covenants, unconditionally, to pay them. No objection can lie to it, then, in this respect.

The trust fund cannot be abused, so long as the parties to the deed attend to their own interest, or a court of equity does its duty.

To allege that it is invalid, because only ten of the trustees have signed it, is, in effect, to destroy a court of equity, in regard to the management and direction of such estates.

To affirm that the trust must fail, because the estate is vested in the debtors of the Bank, is to violate the dictates of natural justice and of equitable assignments, that make their debts assets for the payment of creditors.

To endeavor to raise a presumption of fraud against the deed, on account of the time of payment allowed to its debtors, is to destroy alike the interests of the creditors, the corporation, and the stockholders. The idea of less time being given, or the mode of payment materially altered, amidst universal embarrassment and great pecuniary distress, we are sure, can never find countenance or support in a court of equity, which is, emphatically, called a court of conscience.

To say that we must close our eyes and shut our senses against the universally admitted distressed condition of the country, and the probable means of the debtors of the Bank to make payment, would be to require us to exclude light, lest truth might be revealed and established.

The deed, upon its face, carries, to our minds, strong and persuasive evidence, that it is not only free from the imputation of fraud, but that it was executed in good faith, and under the firm belief that it would cure the evils intended to be remedied; which were, that its creditors should be secured and paid, its circulation called in and cancelled, and its debtors protected against injury and oppression. It proposed to do this, because the Bank was unable to meet its immedi-

Conway et al., *Ex Parte.*

ate demands, to pay specie upon its notes, or to discharge the interest upon the bonds of the State.    These objects were, certainly, just and equitable, and the reasons adduced in support of them, cogent and conclusive.

The law presumes the creditors and stockholders to have assented to the assignment.    They are represented by the trustees; for the assignment is held to be made for their benefit.    Neither of these parties has come in and sought to impeach the deed for want of the requisite formalities of law, or for want of consideration, upon the ground of fraud.    Whenever they apply to a court of equity, they will be heard against the deed; and, if it can be shown to be fraudulent, it will be set aside as unjust and inequitable.    The validity of the assignment is now questioned, and its authority attempted to be defeated, by a majority of the local directory of the Principal Bank, whose jurisdiction and control over its assets and funds ceased and were extinguished, the moment the deed was executed.    This Court cannot allow them to retain possession of the property and effects of the Bank, under such circumstances, as they hold the deed to be lawful, and therefore operative, and, of course, they are bound to protect all the vested rights that have sprung up under it.

We are fully impressed with the magnitude of the interests, as well as the importance of the principles, involved in this case: our decision will seriously touch both public and private rights; and we have, therefore, given to each of the several questions we have investigated, the most mature consideration and deliberate reflection; and the result of all our inquiries and researches is: we are firmly convinced that the deed of assignment is valid, upon its face, and that it contains no such unjust or inequitable provisions as will defeat its operation, or as will raise an imputation of fraud against it.

In coming to this conclusion, we have not deemed ourselves at liberty to imagine fraud, or calculate consequences.    The one must be proved by clear and satisfactory evidence; the other weighs less than nothing in the scales of justice.    This Court can alone tread the path of law and of duty, made clear and manifest by the light of reason and force of authority.

It is therefore ordered, that a peremptory mandamus be issued out

of this Court, commanding the Judge of the Fifth Judicial Circuit to grant the injunction prayed for, agreeably to the rules of chancery practice, and in conformity with the opinion here delivered; which is, that an injunction be granted, without requiring any additional security from the trustees, who have already given bond for the faithful performance of the trust; and that the property, assets, and effects of said Principal Bank, be immediately surrendered into their hands, and that a reasonable time be allowed the other trustees to execute their bonds required in said deed, and thereupon they be permitted to join in the management and control of the trust estate; and that, if they fail to execute the bonds within the time allowed, other trustees be appointed in their place.

RINGO, C. J., after giving a summary of the bill, &c., said: Previous to any consideration of this case, as made and presented by the bill, I deem it proper to state some of the leading and governing principles in relation to the frame and structure of original bills in equity, generally, which, in some measure, depend upon the object sought to be obtained. But, according to my understanding, the rule is universal, that every bill must have for its object, one or more of the grounds upon which the jurisdiction of a court of equity is founded. That jurisdiction sometimes extends to the final decision of the subject matter of the suit; sometimes it is only auxiliary to the decision of a present suit brought, or to a future suit, to be brought in another court; sometimes it is merely of a precautionary or preventive nature, to avert a meditated or threatened wrong; and sometimes it is merely to require, that the parties really interested in a controversy, should be compelled to litigate their rights, without peril or expense to a mere stakeholder having no interest therein. The bill may, therefore, either complain of some injury which the party exhibiting it suffers, and pray relief according to the injury, or, without praying relief, it may seek a discovery of matters necessary to support or defend another suit; or, it may seek to preserve or perpetuate testimony; or, it may complain of a threatened wrong, or impending mischief; and, stating a probable ground of possible injury, it may pray the assistance of the court, to enable the party exhibiting the bill, to protect or defend

himself from such wrong or mischief, whenever it shall be attempted or committed. *Story's Com. Eq. Pl.* 7. The same author (p. 8) also gives another rule, which I understand to be universal, that "whatever may be the object of the bill, the first and fundamental rule, which is always indispensable to be observed, is, that it must state a case within the appropriate jurisdiction of a court of equity. If it fails in this respect, the error is fatal, in every stage of the cause, and can never be cured by any waiver, or course of proceeding by the parties; for consent cannot confer a jurisdiction not vested by law. And, though many errors and irregularities may be waived by the parties, or be cured by not being objected to, the Court itself cannot act, except upon its own intrinsic authority, in matters of jurisdiction; and every excess will amount to an usurpation, which will make its decretal orders a nullity, or infect them with a ruinous infirmity."

Another general rule, but one to which there are some exceptions, I admit, unless the rule be made universal by our statute, *Rev. St. p.* 158, *S.* 1, as to which I deem it unnecessary, now, to inquire, is, that a court of equity "has jurisdiction in cases of rights recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the courts of common law." 1 *Story's Com. on Eq.* 32. And the converse of this rule I consider equally as well established as the rule itself.

Another rule, applicable to all original bills praying for relief, is, that it must be founded on some right claimed by the party plaintiff, in opposition to some right claimed, or wrong done, by the party. defendant. And, in order to enable the Court to understand the case, and administer the proper remedial justice, as well as to apprise the opposite party of the nature of the claim, and of the redress asked, and to enable him to make the proper defence thereto, it is indispensable that the bill should contain a clear and exact statement of the material facts. It must, therefore, show, with reasonable certainty, the rights of the plaintiff, the manner in which he is injured, the person by whom it is done, the material circumstances of the time, place, manner, and other incidents; the relief sought; the prayer therefor; that the defendant may answer, upon oath, the matters charged against him, and that the case, as stated, and the relief, as asked, are

properly within the jurisdiction of a court of equity. *Story's Com. Eq. Pl.* 19. And care must be taken, that the equity of the plaintiff's case should be fully averred in the stating part of the bill; for, if it should only be stated in the charging part of the bill, and thus consist only in the pretences, the charge in answer to those pretences, and the admissions, it will be insufficient. *Ib.* 28, 214. It is, also, a general rule, that a prayer of general relief, without a special prayer of the particular relief to which the plaintiff thinks himself entitled, will be sufficient, and that the particular relief which the case requires, may, at the hearing, be prayed at the bar; but it is not universal. And if there is no prayer of general relief, but a prayer for special relief only, then, if the plaintiff mistake the relief to which he is entitled, no other relief can be granted him, and his suit must fail, at least, unless an amendment of his prayer is allowed him. *Ib.* 40, 41.

Having thus stated some of the leading principles which, as it seems to me, should influence the decision of the present case, I will pass over the question as to the power of this Court to issue a writ of mandamus, to compel the Judge of the Circuit Court to award the writ of injunction, as prayed for by the complainants, as, in respect thereto, I concur with the Court, and proceed to consider whether they have shown themselves entitled to such writ. Admitting the deed of assignment to be valid, the bill shows, in such of the complainants as have complied with the conditions therein prescribed, by executing the deed, and giving the security thereby required, a legal title to all of the property and assets of the Bank, held subject to the trusts thereby and therein declared; that the complainants were in possession thereof; that the defendants have taken possession of all the assets and property of the Bank at Little Rock, and refuse to deliver it over to complainants, or make, or permit to be made, any schedule thereof, or to permit them to receive and control the same, or to perform their trust, and prays a decree that the defendants, their agents, and confederates, may be perpetually restrained and enjoined from further intermeddling with any of the property, effects, or assets, so assigned and transferred, and a writ of injunction, so restraining and enjoining them, until the further order of the Court. This I under-

stand to be the whole scope and substance of the allegations contained in the bill. There is no prayer of general relief; no allegation as to the time when, or the circumstances under which, or the character in which, the defendants possessed themselves of the property, or that their possession is illegal, or was taken without the authority and consent of the complainants; nor is there any allegation as to the character in which they hold the possession, whether as directors of the Bank, or mere individuals, or that they set up or claim any right or title whatever to the property, or the possession thereof, either legal or equitable, in opposition to the rights of the complainants; nor is there any allegation that the defendants have, in any manner, used, assigned, or disposed of, the property, or any part of it, or that there is any apprehension or danger that they will do so; nor of their wasting, injuring, or destroying it, or making any unlawful, unauthorized, or fraudulent use thereof, or that they are either bankrupt, insolvent, or unable to pay the value thereof; nor is there any allegation particularly describing the property and effects so in the possession of the defendants, or stating its value; nor is there any allegation that the complainants are ignorant thereof, or unable to show it, or that it is a matter only within the knowledge of the defendants; nor any prayer that they shall discover or make out a schedule of it, for or with the complainants, or otherwise; nor is there any allegation that the defendants obtained the possession of the trust property, either by fraud or accident. And, therefore, according to the general rules stated above, as laid down in *Story's Com. Eq. Pl.* 28, and reiterated and illustrated at page 214 of the same volume, the case of the complainants could not be aided by any thing contained in the bill, consisting only of the pretences of the defendants, and the charges in answer thereto, even though some equitable ground for relief was thereby suggested or shown. And this rule prevails, even when the facts rest within the knowledge of the defendant; if it constitutes a material allegation in the bill, and is the foundation of the suit, it must be clearly stated; and that every fact essential to the plaintiff's title to maintain the bill, and obtain the relief, must be stated in the bill, otherwise, the defect will be fatal; for no facts are properly in issue, unless charged in the bill, and, of course, no proofs can be gen-

erally, offered of facts not in the bill; nor can relief be granted for matters not charged, although they may be apparent, from the other parts of the pleadings and evidence; for the Court pronounces its decree " *secundum allegata et probata.*" And, therefore, neither the showing of the pretences of the defendants, that the deed of trust is fraudulent and void; nor the charge in answer thereto, that the Central Board had power to make it; that it is good in law; that the defendants do not desire an adjudication as to its validity, or to act legally in the matter; and that they do not believe the deed illegal, determine to hold the property with strong hand, and illegally and violently, can, consistently with the rules and principles uniformly and universally admitted as governing the pleadings in courts of equity, be regarded as facts upon which either the title of the complainants to relief, or the jurisdiction of the Court can be based.

The case made by the bill, when divested of the matters brought into view, consisting only of pretence and charges in answer thereto, cannot, as I conceive, in any respect in which it can be viewed, be considered as essentially different from what I have stated it to be; at least it cannot, from the facts, as shown by the bill and exhibits, be more favorable to the demands of the complainants.

The first inquiry, then, in this, as in every other case, is, has a court of equity jurisdiction of the case? If it has, and the facts, as stated in the bill, are such as entitle the complainants to the specific relief prayed, the judge was bound to grant it. But if the case is not within the jurisdiction of that court, or fails to show the complainants entitled to the relief prayed, it was correctly refused. To determine this question correctly, it will be necessary to advert to some of the grounds upon which the jurisdiction of that court is maintained, and see if this is such a case as they embrace. The most fundamental principle in respect to the jurisdiction of a court of equity, I understand to be, that it exercises jurisdiction in cases of rights recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the courts of common law. The power of the court rests upon this principle mainly; and although there are some cases of concurrent jurisdiction, they are comparatively few, and exist only where the courts of law, acting

upon more enlarged and liberal principles than they anciently did, afford a remedy in such cases, which was denied when courts of equity first assumed jurisdiction thereof. But there can be no pretence, I apprehend, that this case belongs to that class. Subject to the general rule just stated, courts of equity have, as I conceive, jurisdiction of all cases of alleged fraud, accident, or trust. No one, I presume, will attempt to maintain, that a court of equity has jurisdiction of this case, on either the ground of fraud or accident, as there is nothing in the bill stating, or tending even to establish either. But those who claim for that court this jurisdiction, rest their claim, as I understand, exclusively upon the ground, that the case made by the bill is one of trust. And it is upon this ground, as I am informed, that this Court determines the case to be within the jurisdiction of a court of equity; and in its opinion asserts the broad principle, that the court of equity, when the trust was created, acquired jurisdiction immediately over the trust property, and every right and incident connected with it. I do not so understand the law. A trust I consider as something essentially different from the property which is the subject matter of the trust. STORY, in his Commentaries on Equity, when treating of trusts, vol. 2, p. 230, uses the following language: "A trust, in the most enlarged sense in which that term is used in English jurisprudence, may be defined to be an equitable right, title, or interest in property, real or personal, distinct from the legal ownership thereof. In other words, the legal owner holds the direct and absolute dominion over the property, in the view of the law; but the income, profits, or benefits thereof in his hands, belong wholly or in part to others. The legal estate in the thing is thus made subservient to certain uses, benefits, or charges, in favor of others; and these uses, benefits, or charges, constitute the *trusts* which courts of equity will compel the legal owner, as *trustee*, to perform in favor of *cestui que trust*, or beneficiary." So Lord HARDWICKE, in *Sturt vs. Mellish*, 1 *Atk.* 612, thus defines it: " A trust is where there is such a confidence between parties, that no action at law will lie; but is merely a case for the consideration of this court," referring to the court of equity where he then presided. And Lord COKE, in describing the nature of a use or trust, in land, according to the common law, is said by

Judge STORY to have used the following language: " A use is a trust or confidence reposed in some other, which is not issuing out of the land, and to the person touching the land; scilicet, that *cestui que use* (beneficiary) shall take the profits, and that the terretenant shall make an estate according to his direction. So as *cestui que use* had neither *jus in re*, nor *jus ad rem*, but only a confidence and trust, for which he had no remedy by the common law; but for breach of trust his remedy was by subpœna in chancery: so that the original fiduciary estate, from its nature, imported the enjoyment of the profits of the land, as distinct from the seisin of the land, and the rights issuing thereout." *Story's Com. Eq.* 232. These authorities I consider as conclusive upon the question, as to what a trust is, and as drawing the line which divides the jurisdiction of the courts of equity, and courts of common law, in respect to controversies relative to the trust property, so plainly and distinctly, and, at the same time, so accurately, that it would be difficult indeed, by any manner of elucidation, to make it more plain. The true principle established by all of the authorities, I understand to be this: that a court of equity has jurisdiction of all trusts, when its aid is shown to be necessary, either to establish the trust, to enforce its execution, or to protect and preserve the estate; and in such case it will be exercised either at the instance of the trustee or the *cestui que trust;* but it can never be exercised at the instance of the trustee, or indeed any part, in a case where the remedy is plain, adequate, and complete at law. And here it may be proper to remark, that the remedies afforded to the *cestui que trust*, to protect and enforce their rights, are generally, if not universally, cognizable alone in the courts of equity. The reason is, because their rights are always equitable rights, the legal estate not being in them, but in the trustee, while, on the contrary, the remedies of the trustee, in respect to the trust estate, are generally to be sought alone in the common law courts; the reason of which is, because the legal title is in him, and therefore his rights being legal rights, he has a plain, adequate, and complete remedy at law to enforce them. If this is not the true rule, and the principle asserted in the opinion of the Court constitutes the true one, any party having legal demands against another, who prefers having them adjudicated in a court of equity instead of a court of law, may,

by the simple process of assignment, vest the legal title in a trustee, for the use of a third party or himself, and thereby transfer the adjudication from the legal to the equitable forum. Apply this principle to the case under consideration, and every debtor to the Bank may be sued by the trustees, in a court of equity. Let it also be applied to another class of trustees, and they, too, may prosecute every legal claim held by them in a court of equity. I allude here to executors and administrators, between whose rights, in this respect, and the rights of trustees created by deed, I can perceive no distinction, either legal or equitable; and thus the principle, when carried out to its legitimate consequences, enables a plaintiff to elect, at will, the forum in which he will prosecute his demand.

The principle upon which the opinion of the Court, as to the question of jurisdiction, is based, is therefore, in my opinion, not well sustained, either by authority or reason. Can it be pretended that the deed of assignment, from the Bank to the complainants, *if valid,* does not vest in such of the trustees as have accepted the trust according to the terms of the deed, the legal title to the property, money, and choses in action, belonging to her at the time it was executed? Under our statutes of assignments, the legal title could be transferred; and, although it is the usual practice to endorse the assignment of bonds, notes, bills, &c., on the back of the instrument itself, I presume no one will contend that an assignment thereof, by a separate instrument, or on a different paper, will not be as effectual to pass the legal title, as if the like assignment was endorsed upon the instrument itself. If this be true, will it be pretended that the trustees, without showing any equitable ground, whatever, for so doing, can resort to a court of equity, simply to coerce the payment of such demands, and thereby deprive every debtor of the Bank of his legal right to submit his case to a jury? I presume not. In this respect, as before remarked, I know of no legal distinction between the rights of trustees, whether created by deed, by will, or by law. And I think no one would be so bold as to contend, that an executor or administrator could sue the legal debtors of his testator or intestate, in a court of equity, upon the simple showing that he holds the demand as trustee. And yet, for

aught that I can discover from the bill of the complainants, his right to do so would be equal to theirs.

Now, for the purpose of testing this principle a little more fully, suppose an executor, having actual possession of a horse, the property of his testator, should lose him, without fault on his part, and afterwards find him in possession of a third person, who refuses to restore him, on the ground that the will of the testator is void, could the executor, upon simply showing these facts, resort to a court of equity, to enjoin such person from intermeddling with the horse, or to compel him to deliver up the possession? In my opinion, he could not. Again, suppose the complainants, under the conveyance to them as trustees, once had the possession of the real estate and banking-house, in Little Rock, but were ousted, and forcibly ejected therefrom, by persons claiming the possession adversely; or, setting up no right whatever, should refuse to surrender the possession to them, could they, by simply showing these facts, entitle themselves to an injunction, restraining those in actual possession from intermeddling with the premises, or occupying them, or recover possession in a court of equity? In my judgment, that court would have no jurisdiction of the case; and their only remedy would be in a court of law. How much stronger is the case made by the bill, in respect to the real estate and banking-house, alleged to be in possession of defendants, to prevent whom from intermeddling therewith, the bill prays an injunction. If there is any material difference between the case supposed and the facts stated in the bill, as regards the real estate and banking-house at Little Rock, I am unable to discover it.

Now, suppose such injunction was granted, what would be its effect? Would it so operate as to oust the defendants of their possession, and restore it to the complainants? If this would be its operation, I know of no principle, either in law or equity, authorizing it. If such would not be its effect, what good purpose would be accomplished by it? I can discover none. And these remarks apply with equal justice to all of the trust property and assets alleged to be in the possession of the defendants; for, upon the present bill, containing neither a general prayer for relief, nor any special prayer for the restoration and delivery up of any of the property and assets to the complainants, no

Conway et al., *Ex Parte.*

decree directing the possession thereof to be delivered to them, could, without violating and overstepping all the rules of proceeding in equity, ever be pronounced, as, I trust, has already been sufficiently shown; and if that end could not be attained by such decree as the Court would be warranted in making, upon the final hearing, *a fortiori*, it cannot, by means of an injunction, awarded upon the institution of the suit, or before the final hearing. Now, unless the injunction is designed to effect a transfer of the possession of the property from the defendants to the complainants, I cannot understand what benefit the complainants could possibly derive from it; and, inasmuch as there is no statement in the bill showing, or even conducing to show, that there is even a shadow of danger that the defendants even contemplated making any unlawful or unauthorized use of the property, or that there is even the most remote probability that it will suffer deterioration or injury at their hands, or from their possession, I can perceive no ground upon which an injunction restraining them simply from further intermeddling with it, can be based. This is the extent of the prayer of the bill. Can the injunction, if one be granted, be more comprehensive? If not, the property and assets would, notwithstanding the injunction, remain in the possession of the defendants; and the act of the Court awarding it would, as it seems to me, be not only unauthorized, but nugatory. Now, in respect to a change of the possession, I hold it to be a universal rule in equity jurisprudence, that the possession of the property will never be transferred, or passed over from one of the parties litigant to the other, by injunction or otherwise, previous to a decree establishing the right; and this rule rests, as I conceive, upon the soundest principles of reason and law. A contrary practice would be nothing short of taking an estate, recognized by law, from one person, and giving it to another claimant, without first affording to the former any opportunity of being heard in vindication of his rights; the law, always regarding the actual possessor as the rightful owner until the contrary is established by some adjudication, not only determining the right, but also binding upon the parties. Having thus shown, as I think, conclusively, that the court of equity cannot exercise jurisdiction of the case on the ground of trust, I will proceed to examine shortly, whether the complainants, for aught that is shown

49

in their bill, have not a plain, adequate, and complete remedy at law, for every right or thing claimed by the bill. That they have to recover the possession of the real estate and banking-house, has been sufficiently shown already; and if the deed of assignment has passed to them the legal title of the choses in action, which it purports to assign and transfer to them, and of which, as they show themselves, they took and had the possession under the deed and assignment, what obstacle or impediment is stated, or shown to exist, in the way of their legal remedy? If they have the legal title, will it be pretended that they cannot maintain either an action of replevin or detinue, for the books, papers, bonds, notes, and bills, to recover them specifically, or an action of trover, for the money and choses in action? No one can doubt it. In what respect, then, is their legal remedy deficient? The evidence, to establish their right, must be presumed and taken to be in their possession or power, because the contrary is neither stated nor suggested. The ability of the defendants to satisfy their demands, must be either presumed or considered as admitted, as it is nowhere denied, or even questioned. Is the remedy, by these actions at law, so complicated, so abstruse, or so little understood, as to render the prosecution thereof difficult, or the result uncertain? This, I presume, no one will attempt to maintain. Is it, then, inadequate? By the action of replevin, they could obtain the immediate possession of the books, and, perhaps, of the various choses in action, and other papers. So, by the action of detinue, the books, papers, and choses in action, could be recovered with less delay than they regularly could be in a court of equity; and in an action of trover, the value of the money, choses in action, and all other personal estate, (exclusive, perhaps, of the books), could be recovered to the uttermost farthing. I cannot, therefore, doubt that the complainants' remedy at law, from their own showing, is in every respect plain, adequate, and complete.

Having said thus much in regard to the claim of jurisdiction on the ground of trust, and inadequacy of the legal remedy, I consider it not amiss to state, that the bill wholly fails to show any such relation between the parties, as excludes either from litigating the matters in controversy in a court of law, as, between them, no trust or privity whatever is shown. Nor does the bill seek to establish a trust, either

as between the parties to it, or any other parties whatever; but, on the contrary, it shows a deed purporting to be executed by the Bank, in which all of the complainants, and no other person whatever, are named as trustees; and they are all claiming to act in the execution of the trusts declared in the deed, as appears conclusively, so far at least as it regards this case, from the fact that they have all joined in the prosecution of the suit. What trust is sought to be established by the bill? None, that I can discover; for the deed, exhibited with the bill, establishes the trust, and there is no express allegation in the bill that it is defective, imperfect, or incomplete, nor that there is any defect of trustees qualified to receive the estate and execute the trust; nor is the Court called upon by the bill to supply any such defect or deficiency. And here I will simply remark, that I am not aware of any principle upon which the trustees, under such circumstances, could be warranted in calling upon a court of equity to adjudicate upon the sufficiency of the deed, or the Court could be justified in proceeding to a decree as to its validity. And I think I cannot be mistaken in asserting the principle, that this cannot be done in any case, in the absence of the *cestuis que trust* specially provided for by the deed; because it is for their interest alone, every trust is supposed to be executed; and yet, notwithstanding, not a single beneficiary is brought before the court by this bill, or otherwise made a party to the suit. A strange and unprecedented mode, this, as it seems to me, of obtaining an adjudication upon the validity of a deed, on its face good, at least as to the execution of it, and as between the complainants, who are the trustees created by it, and the Bank; and these, if I understand the scope of the bill, are, and were designed to be, the sole and exclusive parties represented in the proceeding. Now, I hold, that neither party represented here, can, according to the plain principles of law and equity, consistently with the case made by the bill, call upon any court either to establish or overthrow the deed, and thereby confirm or defeat the trusts created by it. But why is it that they cannot? One reason is, because neither party has, or can have, any beneficial interest in it. The trustees have no such interest, and, as trustees, can receive nothing beyond a fair compensation for their services; for the payment of which, the deed, in this instance, ex-

pressly provides. See 2 *Story Com. on Eq.* 241, 510; 2 *Fonb. Eq. b.* 2, *ch.* 7; *J. Ch. R.* 527, 532 to 535, *Manning vs. Manning.* The defendants, as directors or representatives of the Bank, can have none, because the whole property and assets of the Bank are, by the deed, transferred to and vested in the others, and so placed beyond her power and control, for the exclusive use and benefit of her creditors; and even though the deed might be fraudulent in respect to the latter, they might, nevertheless, I apprehend, waive the fraud, and take under it, according to its provisions. But if it was even admitted to be fraudulent as regards creditors, I am not aware of any principle upon which either the Bank or the trustees could call upon a court of equity, either to confirm or avoid it. And, in this respect, the case, as it appears to me, would bear a striking analogy to one where several partners convey and deliver the possession of the whole of their partnership estate and effects to a trustee, for the payment of the debts due by the firm; and one of the partners, subsequently obtaining possession of a part of the estate so conveyed, refuses to restore it to the trustee, under pretence that the deed is void; and the trustee brings a bill against him alone, stating these facts merely, and thereupon insists upon a decree establishing the deed and confirming the trust, and an injunction in the mean time. Would any court of equity entertain such cases? The answer, I conclude, must be in the negative; and this, not only for the reasons before stated, but also upon the additional ground, that the decree, when made, would bind no party whose rights were not already concluded, fixed, ascertained, and established, by the deed. Besides, if such proceeding should be authorized, and the decree pronounced upon it be held to establish the validity of the transaction, it would be opening too wide a door to the perpetration and consummation of frauds, the consummation of which it is the peculiar province of courts of equity to prevent. But suppose the Court should, upon the ground that it is necessary and proper to establish the trust, proceed to decree, not only that the deed has every essential requisite of a valid instrument of conveyance and assignment, but also that the transaction is *bona fide,* as it must do, if it makes any decree to establish the trust; and then suppose the transaction impeached by the *cestuis que trust,* as they have an un-

questionable right to do, not being parties to the decree, on the ground that it is not *bona fide*, but fraudulent and inequitable, and designed expressly to obstruct, hinder, delay, or defeat their legal demands, or upon any other ground whatever. In what attitude would the Court stand in adjudicating their rights? This I leave those who undertake to maintain the jurisdiction of the Court, to answer.

I have carefully examined all the cases and authorities cited in the brief, in reference to the question of jurisdiction, but find nothing in them to warrant its exercise in a court of equity, in such case as the present; but, on the contrary, they, in my opinion, confirm fully the principles above stated. In the case of *Walwyn vs. Lee*, 9 *Ves.* 33, the bill was filed to obtain possession of, and compel the delivery up of, conveyances and title deeds to land, which was in the possession of the complainant, and of which he claimed to be the legal owner. The defendant pleaded that he was a *bona fide* purchaser of the land, for a valuable consideration, without notice, and the plea was allowed.

The case of *Fells vs. Reed*, 3 *Ves. Sr.* 70, was a bill to obtain possession of, and compel the delivery up of, a certain silver tobacco box, and two silver cases, belonging to a company, and adorned with engravings, &c., which was decreed.

*Lowther vs. Lowther*, 13 *Ves.* 95, was a bill to obtain possession of, and compel the delivery up of, a certain picture; and the bill was entertained.

*Lloyd vs. Loaring*, 6 *Ves.* 772, was a bill exhibited by a society of freemasons, against some of their officers, to obtain possession, and compel the delivery over, of certain books containing the proceedings of the society, &c. The bill stated, that the defendants threatened to burn or destroy the books, papers, &c., of the fraternity; that the complainants were ignorant of the specific articles, and that the defendants refused to discover them; and prayed for injunction, discovery, and general relief.

The case of the *Duke of Somerset vs. Cookson*, 3 *P. Wms.* 330, was a bill to obtain the possession of an old silver altar-piece, remarkable for a Greek inscription, and its dedication to Hercules. The suit was entertained.

The four last cases were entertained on the ground, that the things sought to be recovered were of such a nature, that their loss could not be compensated in damages, and, therefore, all legal remedies therefor were inadequate.

The bill in the case of *Nicoll vs. Trustees of Huntington*, 1 *J. Ch. R.* 166, was retained on the principle that it was necessary to prevent a multiplicity of suits. The case of *Benson vs. Leroy*, 4 *J. Ch. R.* 651, 656, was that of a bill by creditors against trustees, executors, &c., created by will, stating that they held property for or subject to the payment of their demands, and prayed a discovery and sale for that purpose, which was supported on the ground that the remedy at law was inadequate. The case of the *American Ins. Co. vs. Fisk*, 1 *Paige*, 90, was that of bill showing an accidental obliteration of the marks on cotton bales, the right to which was the matter in controversy; and the court took jurisdiction of it, principally, on the ground that the remedy at law would be difficult or doubtful, because of the impossibility of identifying the property, so as to establish the legal ownership. The bill also stated some other equitable circumstances.

And in the case of *Keyes vs. Brush*, 2 *Paige*, 311, the bill exhibited by a trustee against his assignor, stated, expressly, a design on the part of the assignor to sell, assign, and transfer certain choses in action, goods, &c., which were, or were intended to be, embraced in and by the deed of assignment, which were particularly described in the deed; but the assignor had expressly stipulated to make out a schedule thereof, and that the complainant was ignorant of the particular notes, choses in action, property, &c., so assigned; and the defendant refused to make a schedule thereof. The court entertained the bill, and awarded the injunction, on the ground that it was a proper case for discovery, and the injunction was necessary to prevent irreparable injury, and therefore the complainant's remedy at law was inadequate.

These are believed to be the principal cases relied on; and it must, I think, from the concise statement above made, of the principle upon which the court proceeded to exercise jurisdiction in each case, be apparent, that the present case, as made by the bill, is not embraced within any of the principles upon which the court of equity exercised its jurisdiction over either of them; but, on the contrary,

they expressly recognize the principles which I have stated, and proceeded in accordance therewith.

But there is another principle which I consider applicable to the present case, to which I will here advert. I hold it to be a general rule, that all of the complainants named in the bill must be shown to have a present joint right to the thing demanded, and the relief sought; otherwise, the bill is defective on its face, and no relief can be granted upon it. Now, the bill in this case shows on its face, that the deed of assignment, in express terms, requires each and every one of the trustees to execute it; and to give bond with security, in the sum of twenty thousand dollars, to the attorney of the Bank, which is required to be approved by three stockholders. These conditions are prescribed by the deed itself, and are equivalent to an express declaration of the intention of the assignor not to part with the estate until such security as was deemed sufficient to insure the faithful performance of the trust, was given by the trustees; and it is such a condition as the assignor had, as I consider, an unquestionable right to prescribe; for, as the legal owner of the estate, voluntarily parting with it, the assignor could certainly have parted with it *bona fide*, absolutely, or upon any lawful condition, or could have retained it at will; and it was in the full exercise of this right that the Bank, in this instance, consented to convey and transfer to trustees, for the benefit of her creditors, all her property of every description; but only upon the express condition, that the trustees should execute the deed, and give the security prescribed by it. This, as I understand it, constituted a condition precedent, to be performed by the trustees, before any right vested in them; and upon the performance of these conditions, but not otherwise, they could accept the trust, and take the property. These conditions, as the bill states, have never been complied with by five of the complainants named in it, and therefore the case falls within the rule last above stated; and as no amendment of the bill can be admitted here, the Court is not warranted in granting relief to those, even, who have performed these conditions, notwithstanding their right should be admitted, or plainly appear; because they claim a joint right, which the Court, under these circumstances, has no authority to sever.

I am, therefore, after the most mature consideration of the case, clearly of the opinion, that it cannot, in any aspect in which it can be viewed, as presented by the present bill, be considered as within the jurisdiction of a court of equity, and that if it was within such jurisdiction, no relief could be granted, because some of the parties complainant are shown, by the bill itself, to have no right whatever to demand it. And further, as none of the *cestuis que trust*, or parties beneficially interested in the transaction, are made parties to the bill, or in any way represented in the case, I consider an adjudication upon the deed, either to confirm or avoid it, as both improper and unauthorized, and therefore refrain from expressing any opinion as to its validity.

For these reasons, the motion for the mandamus, in my opinion, ought to be denied.

*W. & E. Cummins*, for the respondents, presented the following petition for reconsideration:

The directory of the Real Estate Bank at Little Rock would respectfully submit to the Court the following points, in which they believe, and are confident in pledging themselves to show, that error exists in the opinion of the majority of the Court, delivered on the motion for a mandamus.

Before proceeding to notice the points intended to be laid before the Court, it is due to the merits of the question to state, that the directory here have no opportunity of answering the charges contained in the bill of complainants. That no fraud, however gross; no violations of public and private right, however flagrant; no violations of law, however palpable and direct; no usurpation of power by the Central Board of the Real Estate Bank, in giving existence to this pretended deed, could, by the directory, be presented to the Court, other than what the applicants have voluntarily chosen to develope. Neither has the directory, as the case is presented to this Court, any opportunity allowed them, by any legal rule, to show that the act of the Central Board, in declaring the Bank unable to pay its liabilities, in other words, insolvent, and by assigning the assets, so as to remove them from direct liability to her note-holders, and thus delaying the

Conway et al., *Ex Parte*

payment of her debts, and postponing her creditors; and this, too, without publishing to the world a statement of her assets and liabilities, had the immediate effect to depreciate the money in the hands of the people, and deeply injure the credit of the State, and the money of the other Bank.

The opinion delivered rests solely on the alleged equity contained in complainants' bill. Never having urged objections to the exercise of jurisdiction by this Court, by mandamus, over the action of the Chancellor, we shall confine ourselves to the considerations of the power of the Chancellor over the rights set forth in the bill.

The views of the Chief Justice in relation to the charges, &c., contained in the bill, are so forcible, and so fully sustained by authority, that we shall not attempt to support them by additional authority.

The opinion delivered assumes, that the bill charges the adverse holding the assets of the Bank and Banking-house, to be done and committed by the directory of the Bank at Little Rock. How is this fact charged and made known to the Court? This directory being vested with corporate powers and trusts, can act but in one mode; by assembling, according to the charter, and declaring its will according to the vote of a majority, which will or vote can only be manifested or proven by the records which the Board is required to keep. The acts and will of this Board are to be shown in the same manner with the acts of corporations or courts. The act or will of a court can, like the directory, only appear or be evidenced by the record which the court is bound by law to make. The rule of chancery is, and the same is declared in our statutes—*Revised Statutes*, *p.* 104, *sec.* 50, that a party relying on any record or writing, shall state the substance thereof in his bill or answer, and exhibit an authenticated transcript. Is not this alleged action of the Board the ground of complaint in the bill? If the Board cannot act otherwise than by its vote of record, what other showing could be made before the Chancellor, than the certified record? The action of the Central Board has been so shown to the Court in this case. Surely, by law, this Court can receive no other evidence in this case, than that which the statute, and the practice of the Courts, require. How can the

common requisites of the Courts be waived in this particular instance? This material allegation, on which the whole case rests, is, then, not properly shown, and the Chancellor cannot waive the allegations. There can be no such act, as the Court alleges is set forth in the bill, without there being a record of it. But there is no allegation, that any demand or call was ever made on the local Board. In truth, none was ever made, and no notice was ever given, or is alleged to have been given, to the local Board, of the presence of the trustees or their readiness to take the property. The local Board, by the rule made by the trustees themselves, could not be required to surrender possession until the securities were given. If they choose to waive their own rule, should they not, at least, be required to give notice of this waiver to the local Board? How could the local Board know that they denied possession, otherwise than as they had pointed out? The bill is most clearly defective, in failing to show a notice of readiness, at least, to receive an appearance of the trustees to take possession.

The local Board were not notified by the deed, or the resolutions of the Central Board, when the trustees were to be present, and would take. They set up some claim to have been in possession. How is this shown? We confess, the statements that they appointed E. H. Roane their secretary pro tem., and put him in possession, &c., is, to our minds, novel, as tending to show a legal possession. The trustees had passed a solemn resolution, that possession was not demandable by them until they had given bonds, &c., and then the local Board was to surrender. How did they manage to get possession, dispossess the local Board, and instal their officer in the manner here stated? Was this legal conduct? What had so early in the business disturbed the minds of those individuals? Did their great haste to pay the debts of the Bank prompt this act? Can a Chancellor decide this to be an equitable proceeding? Equity regards consistency of action, straight-forwardness, and singleness of purpose. Are these things to be overlooked in this particular case? But what sort. of a possession was it? They now allege, in another part of the bill, that they do not know what it was they had possession of. Altogether, the statements in the bill omitting to show a possession derived

from the local Board, which was admitted to be in possession, amounts to a new method, which we have not seen in the law books, of acquiring a legal possession. That a court of equity would respect this proceeding, is equally novel. Did haste, darkness of the night, or other emergency, prevent the accurate knowledge of the acquisition? In the opinion delivered by a majority of the Court, it is stated, that the complainants have come into equity to have the trust estate established and protected, and the property conveyed by the deed put into their possession, and placed under their management.

We are at a loss to ascertain from what part of the bill this statement is derived. There is in the bill no prayer to have the property placed in the hands of the trustees. The prayer alone can indicate the relief sought. The opinion, in this particular, most clearly rests in mistake; and no such thing is asked, as stated in the opinion. The opinion must rest on the allegation in the bill, not on facts or assertions not contained in the bill. This opinion is based on an allegation nowhere to be found. The bill simply prays for an injunction; nothing else. The opinion alleges, that possession of the property is demanded, through the aid of the Chancellor; and, on this foreign assertion, the opinion alleges that the bill seeks the establishment of the trusts, and that the estate may be placed in their hands. We cannot be mistaken in reading the bill. The prayer shows but one object—asks but one thing. Suppose the prayer granted, would that establish the trust, or give possession? Surely not. Then the bill does not demand possession, or the establishment of the trusts. It is on this assumed state of facts that the opinion rests. The facts not appearing on the face of the bill, the opinion does not apply to the bill or its facts. There is nothing else to which it could properly apply. It is, therefore, clearly erroneous.

Again: The opinion delivered states, that the property mentioned, house, assets, &c., are now said to be held violently and illegally, by a majority of the local directory. We most respectfully ask the Court, where this is stated, except in the opinion? It is not in the bill. The statement in the bill is, therefore, your orators charge, that they (the local directory) do not desire to act legally in the matter, nor believe

that said deed is illegal, but determine to hold said property with strong hand, and illegally and violently.

Here is a mere charge that the directory *determine* to hold *illegally* and *violently*, not that they do, or have done so, but determine to do so. The *determination* is but the act of the operation of the mind, and not the act. The act itself is not charged. Can a court of equity take notice of, and adjudicate on, the determinations of the parties? We have met with no instance of this, and are sure none can be produced. The desire of the local board, and their belief, are also charged, in the same sentence. These are things not within the cognizance of courts. How can they be modified and embodied in the opinion, as the grounds of judicial action? The Court must act on the case as stated, and on nothing else. The case cannot consist in mere opinion of parties, desires, or determinations, but in things done and made certain. The Court, therefore, cannot act on the allegations of the bill.

Again: The effects of the alleged holding by the directory, as stated in the bill, are repeated in the opinion. These effects are conjectural, prophetic, and exist not in reality, but are placed in the *unexplored future.* The statements are, that "their acts (of the directory) tend to defeat the objects and purposes of the deed, to delay the creditors of the Bank, and to depreciate the paper," &c. The tendency of things—future events, are here dwelt on. No acts of the board are stated, to sustain the conjectures. The majority of the Court takes these things, which have never happened, are not in existence, not pretended to be shown as grounds on which the opinion rests; and, by these statements appearing in the opinion, the world will consider the facts as proven and true. The legal consequences of acts may, perhaps, in agreement, be stated, but these are not legal consequences, nor are they so stated.

These things seem to be embodied in the opinion, to illustrate the objects of the complainants, in filing the application. The Court surely cannot decide any thing relating to the objects or purposes of parties. The decision of a court must rest on facts, and be a declaration of the law on the facts. We must most earnestly protest against the repetition of these matters in the opinion, both on the

grounds of their immateriality, and total want of legal effect, and on the ground that their insertion in the opinion tends directly to affect unjustly individuals who have had no opportunity here or elsewhere to answer the facts, conjectural as they are. The erasure from the opinion of these statements is respectfully claimed, on the ground above stated. We must repeat, that a statement of the objects or purposes of any party, as his expectations or fears, constitutes no part of a judicial investigation. What would the Court say to the conjectures which might be alleged by the defendant in this motion? Would the Court repeat them, uncertain as they would be, and false as they might be. Consequently, such things do not belong to that accuracy, as to law and fact, which is always required in judicial proceedings.

The opinion of the majority of the Supreme Court rests upon these words, as declared, and the principles therein contained, to wit: "We have sufficiently demonstrated these two propositions: that the complainants have come into equity, to have the trust estate protected and established, and the property conveyed by the deed put into their possession and placed under their management; and that the acts complained of are charged against the defendants not as private individuals," &c. To the latter proposition, we will add nothing to what we have said. Our business is with the first and the following: "That a court of equity has full jurisdiction in this case, seems to us a proposition perfectly free from all doubt. The object of the bill, as before remarked, is to have the trust protected, and the estate delivered," &c.

The above remarks contain the statement of the grounds on which the majority of the Court assumes equity jurisdiction: that a trust estate is presented to them by the bill, and that a court of equity is bound to protect such estate.

Now, if, on examination, it should appear, that no *trust estate whatever* is presented to the Court, by the bill, we think the error in the opinion must be manifest. We hold ourselves ready and prepared to establish, by the authority of every writer whose works can be produced on the subject of trust estates, that the bill in this case does not

present to the Court a trust estate, nor does it ask any thing in aid of a trust estate.

A statement of the allegations of the bill is itself proof of our position. The bill states, that on the 2d of April, 1842, a deed of assignment was prepared, and, on the same day, was duly executed by the said Bank, (Real Estate), signed by Carey A. Harris, President thereof, and sealed by the seal of said bank, whereby said bank conveyed unto your orators, who had been appointed trustees by said Central Board, and in conformity to, and under said ordinance, all and singular the estate real and personal, debts, choses in action, property and effects, and interests, &c., belonging to said bank; to have and to hold the same, &c., to your orators, their heirs and assigns, &c. To obtain part of the property acquired by this deed, by complainants, and to prevent the local directory from intermeddling with it, this bill is brought. The bill relates to and sets up before the Court the right and estate acquired by this deed, and no other right or estate. Is not this estate or right the same that any other person acquires by deed, to himself, his heirs, &c. Can he not hold it, sue for it, and protect it in law? Could not the trustees do the same thing under their deed, if it is such as they represent, that other persons can? Is not this right of the trustees to the property claimed, as full, ample, embracing every legal attribute of a perfect, direct, legal title, as language can express, as the mind conceive? Possession is given with unrestrained, absolute right to control, manage, and sell, in the same manner they could any other property, however acquired? Is there any other kind or description of estate presented to the Court by the bill? None can be shown to which the prayer applies, but what is acquired by the deed.

Is this property thus acquired, the rights thus vested in these grantees, a *trust estate?* For they are only taking care of their own estate. We never deemed it necessary on the original argument, to attempt an illustration from authority showing that this was not a *trust estate.* No work can be opened on the subject, which does not show the truth of our position, that this is no *trust estate.*

We will add a few to those which have been presented in the opinion of the Chief Justice.

*Fonblanque, vol. 2d, p. 7,* defines a *trust estate* thus: " Now, an use is a *trust or confidence,* which is not issuing out of the land, but as a thing *collateral, annexed in privity to the estate,* and to the persons concerning the land, viz: that *cestui que use* should take the profits, and that terretenant should make the estate according to his directions," &c. " So that *cestui que use* had neither *jus in re,* nor *ad rem, i e.* neither a right in possession, nor in action, but only a confidence and trust, which the common law, though it took notice of, would not protect, nor give him any remedy for it; but his remedy was only by subpœna in chancery."

Here, then, is a trust estate: a thing collateral; *annexed* in *priority* to the estate, and to the persons concerning the land, neither a right in possession, nor in action, but only a *confidence and trust,* which the common law would not protect.

Now, have these trustees shown such an estate as this in themselves? Is their right to the property collateral? No, it is direct. Is it annexed in priority to the estate? Not so, for they take it to themselves and heirs. Is their right neither in *possession nor in action?* The majority of the Court have decided that, under the deed, they take the immediate possession of the property on its execution. Is not this right to immediate possession a thing recognized and protected by common law? Most surely it is. The trustees taking, under the deed, the direct and entire right in the property, the present possession, not a thing incident to, or collateral, and a right which the common law will protect, and for injuries to which ample remedies are thereby provided, took, by the deed, a legal estate, and most clearly not a trust estate.

How it can be contended, or on what grounds, that the trustees hold a trust estate, we are entirely at a loss to inquire. The estate they hold has none of the characteristics of a trust estate. *Cestui que trust,* or the beneficiary; holds the trust estate, but this is neither *in re* nor *in rem,* neither in possession nor action, but a mere trust—a mere confidence collateral to another estate, which is the legal *cestui que trust,* having no present possession or direct legal right, can only be protected in his latent right, considered under the legal, in a court of conscience. Over this right existing in, and consisting of, the trust,

a court of equity has direct and uniform jurisdiction. This not being such a case, the jurisdiction cannot attach.

There are, on the face of the deed before the Court, trusts created. These trusts rest on others than the trustees. The trusts rest in the creditors, note and bond-holders, and stockholders. They hold a pure trust estate. They have a right collateral to, and issuing out of, the legal estate in the trustees, to be paid their respective debts; but they have not a present possession in any right which a court of law could recognize. If the trustees break the trust, or injure the trust estate, or fail to comply with the contracts of the deed, then they can protect their rights before a court of equity. The trusts created for their benefit belong to them—cannot be claimed, or enjoyed, or enforced, by others, before a chancellor; and this is what is meant by establishing a trust. It is the enforcement of his rights, in a court of equity of *cestuis que trust,* which they alone can bring before the Court, being the owners thereof.

Now, the trustees, having the legal interest, are bound to take care of the estate which is in their own hands, and themselves to confirm and execute the trusts. They have no right to come before a court of equity, setting up the trusts which belong to others. *Cestui que trust,* or his representative, must do this.

We think no authority necessary to establish this principle. No man can come before a court of law or equity, claiming the rights of others. These trustees can only set up, in this Court, their own rights, which, in this case, are strictly legal. The *cestuis que trust,* or beneficiaries, can only claim their rights and equitable interests. It must, therefore, be clear, that, as the trustees cannot present to the Court any other than their own rights, and as the estate they hold is strictly a legal estate, our proposition is established, that no trust estate is presented to the Court by the bill.

In further support of our position as to what constitutes a trust estate, we will refer to *Levin on Trusts and Trustees, p.* 9, who defines the estate precisely as above; that the two estates are distinct in their nature—the legal and equitable; and, when they both vest in the same person, the equitable is lost in the legal.

Same work, *p.* 102: the trustees must hold the legal estate; and this everywhere.

How can it be a question, in this case, whether the trustees hold the legal estate or not, when, by law, they cannot be trustees, without the legal estate vests in them?

Having the legal estate, they cannot claim its protection before a court of equity. They do not show that they own the trust estate; and, if they did, the legal alone could exist.

On the same point, see 1 *Harrison Chancery, pp.* 20, 516; the same definition of a trust estate.

The case of *Benson vs. Le Roy,* 1 *Johnson C. R., p.* 651, is referred to, and relied on, to support the claim of the trustees, on the face of the bill, because it contains this remark, that " by the trusts created for payment of debts, the assets were placed under the jurisdiction of this Court," a court of equity.

This principle is laid down most truly, and we only ask this Court now to follow the principles elicited in the above case, by which the present decision of a majority of this Court would be at once set aside.

The case above stated was in a bill filed by creditors against trustees, to prevent them from wasting an estate, or destroying their trust estate in the assets, by permitting liens to operate to their prejudice, by exhausting the estate. The owners of the trust, *cestuis que trust,* could, as we contended above, have their rights protected, in equity. Trustees having the legal estate, and not the owners of the trusts, cannot, as is claimed here, bring their estates before the Chancellor for protection. See also, *Shepherd vs. McEvers,* 4 *J. C. R., p.* 106, which was a bill brought by a creditor to secure his trust estate, which was sought to be destroyed by the trustees. See also, 1 *J. C. R., p.* 52; *Dexter vs. Stewart.* Here was, also, the same principle asserted, in a bill by the representatives of *cestui que trust,* against the trustee and his assignees.

Here are three cases of the very highest authority, supporting our position, that a trustee cannot represent a trust estate in a court of equity, for the plainest possible reason, that it does not belong to him. One man cannot sue for another estate, nor apply to equity for its pro-

tection. We aver, with the utmost confidence, that no instance can be shown of a mere trustee, in that character, applying for the protection of the trust estate, or its establishment, the trust being dependent on the legal estate held by the trustees, as in the present case.

To assert that the trustees have a trust estate, is to disregard all legal distinctions—to destroy the defined boundaries between law and equity, and the subjects of their respective jurisdiction.

It is alleged that courts of equity will aid trustees, and protect them in the due performance of the trusts, &c. How, or under what circumstances, does this doctrine show, what is attempted to be established in this case, that a court of equity will aid the trustees in establishing the legal estate? It is the equitable only, the Court can consider, not the legal. The authority does not, in the remotest degree, tend to sustain the position on which this opinion rests.

The error consists in considering the estate of the trustees an equitable estate, in express contradiction to any rule on the subject.

No particular trust estate is here shown or brought forward. What is asked of the Court for the *cestuis que trust?* Why, that the trustees may get possession of their legal estate, as the Court construes the bill. It is not asked that a trust estate shall be defined, fixed, or satisfied. Then that authority does not apply to this bill.

We have not time to adduce authority on this subject, but have no fears in asserting, that no case, similar to the present, can be shown, in which equity has taken jurisdiction of the legal estate.

The opinion of a majority of the Court asserts: "Now, if they (*cestuis que trust*) have an undoubted right to the jurisdiction of the Court, the trustees, whose duty it is to preserve the estate, have equally an unquestionable right to relief."

Here the jurisdiction of the Court is claimed for the trustees, on the distinct ground, that *cestui que trust* has a right to the jurisdiction of the Court. This assumption is most clearly erroneous. They do not hold the same estates. Their rights are essentially different. How can the same remedy be applied? We pledge ourselves that this position cannot be sustained by any authority. With regard to the deed set up by the trustees, and its validity, we have not time to adduce much authority. It is admitted that a majority of the Central

Board of the Bank prescribed the terms of the deed, determined on the expediency of the measure, and acted for the Bank in producing this deed, by which she purports to convey all her estate to the trustees. It is also admitted, that the same men take the estate at the same time from the Bank, by the deed made by themselves. In other words, that they, at the same time, acted for the Bank, in making the deed, and for themselves, in taking under the deed.

The opinion of the Court, though not well understood by us, sustains this conduct as legal. We beg leave to submit to the Court the following uncontradicted authority, directly counter to the opinion of the majority of the Court, in this case:

" For he who undertakes to act for another in any matter, cannot, in the same matter, act for himself." See *Levin on Trusts and Trustees*, and *Whichester vs. Lawson*, 3 *Ves.* 750; *Ex parte Lacy*, 6 *Ves.* 625. Per Lord ELDON: " All acts done by parties pretending to act for themselves and others in the same matter, are declared fraudulent on their face, and uniformly held void by courts of equity."

Could the Bank, in making this deed, act for herself? She could not; but must act through her agents. They, in the matter, act for themselves and the Bank, at the same time, and in the same matter. Does the above rule not apply to them most directly?

This rule of law is uncontradicted. No authority can be shown against it. How can it be abrogated and disregarded in this instance? This Court does not, nor can any Court, claim the power to repeal a law of the land. The business of Courts is to declare the law. The suitors in this Court have a right to demand the declaration of the law, and the security of their rights under it. We feel assured the Court cannot, and will not, disregard this most plain rule of law, but will correct the opinion delivered, which is in direct violation of this rule.

See *Angel & Ames on Corporations*, *p.* 60: " Corporations can only act through their agents." This deed, then, could only be executed by the Bank, through her agents. The decision of the majority of the Court admits this deed was created through the action of the Central Board; but the majority of the Central Board made themselves trustees of the same, and in the same act; so that they give

away and alienate from the Bank, the State stockholders, $2,250,000, at the same time that they take the $2,250,000 to themselves. Here, then, they act for themselves and another in the same matter. They, then, clearly violate this rule of law, and their act is fraudulent and void. No authority can be adduced, nor is any pretended, to sustain such an act.

The opinion of the Court assumes the power to take care of trusts in the hands of trustees. For the argument, we will here admit the proposition, adding that if they have the power, it is their duty to do so.

Does it not appear, from the opinion delivered, and the bill in this case, that the local board hold the property mentioned, as trustees, for the benefit of the State, the stockholders, and creditors generally? This trust has been long established, held, and enjoyed, by express provisions of law, aided by individual contracts, rights, and liabilities.

Is not this trust estate, protected by law and solemn contract, entitled to the protection of this Court? Is not the *right* of one trustee as good as the right of another? But the local board have express legal authority to hold and possess this property from the State and others. We think the law is paramount and superior to the deeds of individuals, and vests higher and better title. Deeds made against the scope and object of laws, are void. Is not, then, the right of these trustees inferior to that of the local board?—the first claiming against law and express legal provisions, the latter claiming under laws of the State, which expressly give them power to hold the property, and require them to do so? Can violations of law be authorized and practised in this Court? We think not. Then the rights claimed by these trustees, being in violation of law, cannot be supported.

The Central Board of the Real Estate Bank has no power to infringe or disregard any of the provisions of the laws of the State, or the charter of said bank, as was decided by the Court, in the case of *The State vs. Ashley.*

Then having no power to act in violation of the charter, their acts cannot disturb the legal rights of the local board, who hold according to the provisions of the charter.

The local board holds as trustees for the people of the State and

stockholders under the law. Where is the power to violate this pos-
session? None can be shown. Neither individuals nor corporate
acts could divest them of their legal rights.

But the petition was refused.

After the motion for a re-consideration was refused, the respondents
again, by *Cummins & Ashley*, moved the Court for a re-argument
and re-hearing, and said, in their motion: "this motion is made by
request of the Executive of the State of Arkansas, as appears by his
letter herewith filed." And they moved for leave to file their rea-
sons for a re-argument and re-hearing, at a future day.

The letter of the Governor, referred to in the motion, was as fol-
lows:

*Executive Office, 23th Aug.,* 1842.

Messrs. CUMMINS & ASHLEY,

    *Attorneys for the Real Estate Bank:*

GENTLEMEN—During the investigation of the legality of the deed
of assignment by the Real Estate Bank, before the Supreme Court, I
did not feel myself (as the Executive of the State) called on to take
any steps while the subject was pending before a co-ordinate branch
of the government.

A decision has been made by a majority of the Court, which, to say
the least of it, will place the assets of the Bank, and the management
or control of the institution, beyond the reach of the State, except by
a bill in chancery.

The liability of the State for the whole capital of the Bank, inde-
pendent of the protection which is due to the note and bond-holders,
renders it a subject of deep and vital interest to the people of Ar-
kansas, as to the manner in which the institution is controlled and
wound up.

Without, therefore, intending to be considered by you as officially
interfering, but from a sense of duty growing out of the position I oc-
cupy, and from a hope that a re-examination of the case will tend ulti-
mately to place the institution in a situation which will be more ac-
ceptable and advantageous to all the parties concerned, and as I learn
a second application for a re-hearing, although unusual, is not without
precedent in the highest judicial tribunal in the United States, I

Conway et al., *Ex Parte.*

therefore respectfully suggest for your consideration, whether the interest of the State would not be promoted by an application for a rehearing, if you should not think it disrespectful to make the second application.

I have, at least, discharged what may be considered by some my duty, and shall leave the result and consequences to the proper tribunals.

I am, with respect, your obedient servant,          A. YELL.

The motion was refused by Judge Dickinson, who said:

That the question presented is of vital importance, as regards both the State and its citizens, is conceded. Such is the light in which it has been viewed by the Court. In this, as in all other cases, the difficulty in determining is not the amount in dispute, but the principle involved. No case has ever received more profound attention from this Court, than the one now before us; and in none has its judgment been more firmly convinced. Upon the argument for reconsideration, the whole ground was re-examined, with the same result. We know of but one rule for our guidance—*the law of the land.* Nor can I believe that any legal, unbiassed mind will, after a careful investigation of the authorities, differ with us in our opinion, as to the jurisdiction of the Court, and the validity of the deed. No considerations of public policy not warranted by law—no fears of popular indignation—will ever delay or hasten my decision, when my judgment is once convinced. Totally indifferent to the private views of individuals, however numerous, elevated, and influential they might be, I have never hesitated, even for one moment, in announcing the convictions of my mind. I speak as well for my brother judges as for myself. The labors of no appellate Court in the Union have been more serious than of this. It has been our task to meet questions of the most exciting and complicated character. We have had to interpret a constitution, differing in detail from all the American States, with a code of laws the most defective that was ever imposed upon a free people, and reconcile one with the other. We have endeavored to guard every interest that might be affected, and protect every citizen in the enjoyment of his rights. This Court, it is true, necessarily

possesses great power.  That power has been exercised with an eye single to our public duties; and, conscious of the fearlessness and independence with which they have been discharged, we had hoped to create a confidence in the judiciary, equally as broad as its power. While we neither sought nor declined the responsibility which devolved upon us, whether as a court or as judges, we have exercised no authority not properly conferred upon us by the constitution and the laws, at the same time confining the other departments to their proper and legitimate spheres.  And while we will not permit the rights of the humblest individual to be violated with impunity, we should impair, if not utterly destroy, the confidence of our citizens in the supreme tribunal of the country, if we should suffer it, on the other hand, to be controlled by individuals, or dictated to by either of the other departments.  It is for the *legislature* to declare the public will, the *judiciary* to interpret it, and the *executive* to *enforce it*.  The line of distinction is too broadly marked to be mistaken.

If the *executive* department shall so far lose sight of its boundaries, as to *encroach* upon, or *usurp* the powers of the *judiciary*, or attempt, under the pretext of a deep interest in the general welfare, to influence its judgment, or control its action, such interference should be repelled with firmness, but with dignity.  We may have often erred in our judgment, but all, I trust, will do us the justice to admit, that where once convinced of our error, we have never hesitated to rectify it.  We have never attempted to exercise legislative or executive powers, or influence the action of either.  The constitution forbids it; and while I have the honor of a seat upon this bench, I cannot so far forget the obligations of that instrument, as to permit the rights and authority of this Court to be invaded by either of the other departments.  If such an interference as is attempted in this instance should be submitted to, it would be but a precedent justifying the executive, in any case pending between individuals in this Court, to come in directly as a party, because he might think, however erroneously, that the interest of the State was jeopardized, and, after a decision, ask that it be again reviewed.  If this is permitted in the one instance, it cannot, consistently, be refused in another.  The right once admitted, cannot be limited.  Then, indeed, would the community have

cause to tremble for their security.     Better at once unite the two departments, if one is to be dictated to, or rendered subservient to the other.     It has been my pride, while sitting here, to settle the law, if possible, upon a firm and sound basis; to extend protection to every individual, however humble he might be; to guard every interest, whether of the public or of individuals; to secure the confidence of the citizen, by rendering the judiciary respected at home, and elevating the character of the State abroad.     If I have failed in any one of these objects, it has *not* proceeded from a *fear* to travel the path of duty, when sufficiently plain to follow it.     And if, in the discharge of my public duty, I am not sustained by those upon whom it devolves to judge of my judicial acts, I must bow to their decision in silence.

I have discovered no sufficient cause to justify me in disturbing the judgment of the Court, as heretofore announced; and, as I cannot, without compromising the independence of this tribunal, recognize the right of the Executive to interpose his wishes or opinion upon a matter already solemnly adjudicated, the motion must be refused.